498 So.2d 713 (1986)
David HASTINGS and Audrey Hastings
v.
BATON ROUGE GENERAL HOSPITAL, et al.
No. 86-C-1034.
Supreme Court of Louisiana.
November 24, 1986.
Rehearing Denied January 8, 1987.
*714 David Robinson, Baton Rouge, for applicants.
Felix Weill, Watson, Blanche, Wilson & Posner, Donald Phelps, Seale, Smith & Phelps, William Wilson, Taylor, Porter, Brooks & Phillips, and Daniel Reed, Baton Rouge, for respondents.
WATSON, Justice.[*]
In this malpractice suit by the surviving parents[1] of Cedric Paul Hastings, who died of stab wounds at Baton Rouge General Hospital after an unsuccessful attempt to transfer him to Earl K. Long Charity Hospital, it is alleged that Baton Rouge General *715 Hospital, the emergency room physician on duty, and the thoracic surgeon on call, were negligent.

FACTS
On March 1, 1981, Cedric Hastings was admitted to the emergency room of Baton Rouge General Hospital at 11:56 P.M. with two stab wounds and weak vital signs. It is customary to take an emergency patient to the closest hospital, which was Baton Rouge General. Dr. Samuel Reed, the emergency room physician on duty, was due to be relieved by Dr. Joseph R. Gerdes, Jr., at midnight. Both doctors worked on resuscitating Cedric, who had no vital signs, and was moribund. His only respiration was a gasping type which appeared to be ineffectual. Because of a stab wound in the parasternal area, a chest tube connected to an Emerson pump was installed to drain air and blood from the chest. An IV was started to restore circulation and a blood sample was drawn for testing. By 12:25 A.M., Cedric's vital signs had been restored: he was breathing; his blood pressure was up to 90 over 52; and he had a pulse of 112. The next entry by staff nurse Sandra S. Kelly showed blood pressure of 100 over 60 and respiration of 36. Cedric had continued to lose a large amount of blood, at least 1,000 cubic centimeters.
A chest x-ray at 12:15 A.M. showed blood, the tube and a degree of tension. In Dr. Gerdes' opinion, the tension that was present was not enough to compromise the patient's circulation or respiration and was not dramatic or lethal enough to be termed tension hemothorax. Cedric's blood had been typed and cross-matched and two units of whole blood were started at 1:00 A.M. Although unmatched blood could have been used, the patient was not close to exsanguination at 1:00 A.M. when he began receiving the whole blood.
Dr. Gerdes had concluded that a thoracotomy had to be performed. Because he was not qualified by training or experience to perform that surgery, Dr. Gerdes contacted the thoracic surgeon on call that evening, Dr. Edward McCool, and described the condition of the nineteen year old stabbing victim, who had apparently been stabbed in one of the "major blood vessels".[2] Dr. McCool asked if the patient had insurance. After receiving a negative reply, Dr. McCool asked Dr. Gerdes to transfer the patient to Earl K. Long Hospital. In Dr. Gerdes' opinion, the patient was not in stable enough condition for transfer, and he told Dr. McCool: "I can't transfer this patient."[3] Dr. McCool replied, "No. Transfer him."[4] Frustrated by Dr. McCool's lack of cooperation, Dr. Gerdes explained that the only thing he could do for the patient was to put in another chest tube. Dr. McCool said that this would only increase the bleeding, whereupon Dr. Gerdes hung up the telephone. This conversation took place prior to 12:25 A.M.
An emergency thoracotomy takes a matter of minutes. In Dr. Gerdes' opinion, if a thoracotomy had been performed and the bleeding stopped, there was a possibility that Cedric would have survived. Nurse Kelly had observed emergency thoracotomies in emergency rooms which had sometimes saved the lives of patients with stab wounds.
Between 12:25 and 12:45 A.M., Dr. Gerdes reported to nurse Kelly that Dr. McCool wanted the patient transferred to Earl K. Long. Nurse Kelly was not comfortable with the idea of transferring the patient and offered to attend him in the ambulance. Dr. Gerdes was also upset about transferring the patient but gave the appearance of having no alternative.
After receiving a negative response from Dr. McCool, Dr. Gerdes contacted Earl K. Long Hospital. Baton Rouge General had two heart-lung machines: Earl K. Long had none. The emergency room doctor at Earl K. Long said they would be ready for the patient. An ambulance was called, and *716 Dr. Gerdes re-evaluated the patient who still had marginal vital signs, was restless and draining blood from his chest. The ambulance answering service received the call at 1:03 A.M.
When the ambulance personnel arrived at the hospital, driver Tom Crittenden questioned the stability of the patient. It is unusual to transport a patient who is receiving whole blood and has suction draining from a chest tube. Crittenden had never transferred a patient in that condition from one hospital to another.
To transfer Cedric from the critical care area to the ambulance, it was necessary to disconnect the Emerson pump. Cedric's blood pressure was then 96 over 60, his pulse was 120, and his respiration 32. Cedric's vital signs had remained stable from 12:25 A.M. until he was strapped into the ambulance at 1:30 A.M. After removal of the pump, Cedric began to fight wildly, the chest tube came out, and the bleeding increased. During five minutes, his pulse was reduced to 44 and his respiration to 16: his color became ashen, and his pulse weak. His condition deteriorated dramatically. When Dr. Gerdes went to the ambulance, Cedric had virtually bled to death. However, Dr. Gerdes inserted a larger tube and ordered the patient returned to the emergency room. Cedric died of cardiac arrest at 2:00 A.M., after he had been transferred back into the emergency room.
Under the hospital regulations, when a doctor cannot be reached or refuses a call, the chief of the service should be notified so that another physician can be obtained.[5] A physician who is on call must respond to an emergency room summons except when attendance is judged unnecessary.
Dr. Gerdes was employed by the Emergency Physicians Association of Baton Rouge. He is a certified member of the American Board of Emergency Medicine and is a specialist in that field.
Dr. McCool is a board certified thoracic and cardiovascular surgeon, primarily a chest surgeon who operates on the heart, the great vessels, the esophagus and the lungs. Dr. McCool is familiar with an emergency room thoracotomy or ERT. In the case of a penetrating wound to the chest in the parasternal area with copious bleeding, surgery is indicated to repair any damage to the heart or great vessels. There is a chance of survival with immediate surgery. Fifty percent of such patients die from loss of blood or exsanguination before they reach the hospital. Dr. McCool agreed that in the case of unconscious patients without vital signs or spontaneous respiration, an excellent survival rate is 32.1%. When a patient is agonal: semi-conscious with a thready pulse and gasping respiration, an excellent survival rate is 33.3%. In a third group, conscious, with a measurable blood pressure of seventy millimeters or less, in profound shock, an expectable survival rate is 40%. In 1981, there were no trauma center hospitals in the Baton Rouge area, and these survival rates were measured at a trauma center. Dr. McCool admitted that the primary difference between a trauma center and the facilities at Baton Rouge General is the length of time required for surgeons on call to reach the hospital.
When Dr. Gerdes telephoned, Dr. McCool had the impression that the patient was stable from the fact that he had a blood pressure of 90 over 50 and therefore inquired about insurance. After receiving a negative answer, Dr. McCool decided that the patient was stable enough to be transferred to Earl K. Long Hospital.
Dr. McCool was told that the patient had been stabbed in the chest and admitted that he should have asked if the wound were in the parasternal area. He did not recall Dr. Gerdes telling him that the wound might involve a major blood vessel. If Dr. McCool had understood that the wound was in the parasternal area, he would have felt it necessary to go to the hospital. According to Dr. McCool it would have taken him approximately thirty minutes to reach the hospital, twenty minutes to get ready and ten to drive.
*717 An investigator testified that the trip between Dr. McCool's residence and Baton Rouge General Hospital, a distance of 3.9 miles, could have been driven within the speed limit in seven and a half minutes.
If Dr. McCool had gone to the hospital, he would have operated as rapidly as possible to give Cedric a chance of survival. According to Dr. McCool, he would have reported to the hospital if he had known that the patient had continued to bleed profusely.
Dr. McCool testified that he was self-employed and on the medical staff of the Baton Rouge General Hospital with full privileges in thoracic and cardiovascular surgery. In Dr. McCool's opinion, even if he had arrived at the hospital at 12:45 or 12:50, Cedric's lacerations of the liver and heart left almost no likelihood of survival. There was a thoracotomy tray in the emergency room with a hemostat, a rib splitter, and clamps.
Dr. McCool agreed that if he had been present at the scene he would not have transferred Cedric at 1:30 A.M. In retrospect, he did not think the transfer should have been attempted. If he had been present by 1:00 A.M., he could probably have gotten into the chest within fifteen minutes.
At the time of his death, Cedric Hastings was a nineteen year old athlete, approximately six feet three inches tall.
Dorothy M. Gray, the medical staff secretary for Baton Rouge General Hospital, identified the regulation governing the Emergency Service Committee of the hospital,[6] and the hospital's Bylaws which establish an Emergency Service Committee and give rules and regulations governing emergency service by the hospital's medical staff.[7]
Edgar H. Silvey, chief executive officer of the Baton Rouge General Hospital and senior vice-president at the time of the accident, testified that nurses are direct employees of the hospital, but the medical staff is self-governing. However, operation of the emergency room and admission to the hospital are policy matters formulated by the administration and board of trustees of the hospital. Under an agreement with the hospital, the Emergency Room Corporation, comprised from the hospital's medical staff, rotated emergency room duties as directed by the medical staff. The hospital held itself out to the public as furnishing emergency room service on a twenty-four hour basis. Under the Emergency Service regulations, patients were admitted regardless of ability to pay or insurance, and patients were not transferred unless their condition warranted it.
The trial court granted a directed verdict in favor of Dr. Gerdes, Dr. McCool, and the Baton Rouge General Hospital refusing to let the case go to the jury. The court of appeal affirmed[8] and a writ was granted to consider the judgment.[9]

LAW

DIRECTED VERDICT
LSA-C.C.P. art. 1810[10] allows the action of the trial court here, a directed verdict in favor of defendants at the close of plaintiff's *718 evidence. See, for example, Matranga v. Sara Mayo Hosp., 463 So.2d 632 (La.App. 4 Cir.1984), writ den. 467 So.2d 540, where a motion for directed verdict at the close of plaintiff's case was affirmed because there was no evidence of negligence or deviation from the applicable standard of care on the part of the defendant surgeon.
A directed verdict should only be granted when the facts and inferences point so strongly in favor of one party that the court believes reasonable people could not reach a contrary verdict. It is appropriate, not when there is a preponderance of evidence, but only when the evidence overwhelmingly points to one conclusion. See Scott, et al. v. Hospital Service District No. 1 of the Parish of St. Charles, et al., 496 So.2d 270 (La.1986); Breithaupt v. Sellers, 390 So.2d 870 (La.1980).

DUTY OF CARE
LSA-R.S. 40:2113.4[11] imposes a duty on hospitals licensed in Louisiana to make emergency services available to all persons residing in the territorial area regardless of insurance or economic status.
LSA-R.S. 40:1299.41 A. (7) and (8)[12] set forth the duty of health care providers. A physician is required to exercise that degree of skill ordinarily employed under similar circumstances by others in the profession and also to use reasonable care, diligence and judgment. As specialists, Drs. Gerdes and McCool are held to a national standard of care and not that of the Baton Rouge area. Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331 (La.1978). Medical malpractice is an unintentional tort or a breach of contract for health care or professional services.
The Baton Rouge General Hospital Bylaws[13] provide in pertinent part that patients:
"... shall be seen by the Emergency Physicians Association physician and treated or assigned to the physician ... *719 on the Emergency Call Panel for the day.... Personnel in the Emergency Room are instructed to report in writing to Administration any case in which a doctor refuses to answer a call.... When a doctor cannot be reached or he refuses the call, Emergency Room should then call the chief of the service who is responsible for getting someone there or taking care of it himself.... While it is understood that a doctor may refuse to see any patient, it is nevertheless the duty of the doctor on Emergency Call to see anyone for whom he is called, or arrange for the patient to be cared for.... It is the policy of the Baton Rouge General Hospital that no patient shall be transferred to another facility arbitrarily or without due consideration for the patient's condition, the facilities needed for that particular patient's care and other conditions existing at the time."[14]
Dr. Gerdes' application for appointment to the medical staff of the Baton Rouge General Hospital[15] states in pertinent part that he had "received and read the bylaws of the hospital and the bylaws, rules and regulations of the medical staff" of the hospital and agreed to abide by them.
In Hemingway v. Ochsner Clinic, 608 F.2d 1040 (5 Cir.1979) there was a directed verdict for the defendant physicians, their clinic, and insurers on the ground that there was insufficient evidence as to the applicable standard of care, the basis for the trial court's ruling here as to the physicians. On appeal, Hemingway held that expert testimony as to the standard of care is unnecessary where the record and the testimony of the defendant doctors establishes a breach of duty.
Hemingway holds that it is unnecessary to establish a community standard to determine that a hospital has been negligent. Hemingway followed Hunt v. Bogalusa Community Medical Center, 303 So.2d 745 (La.1974) and Bryant v. St. Paul Fire & Marine Ins. Co., 365 So.2d 537 (La.App. 3 Cir.1978), writ refused 367 So.2d 1184 (La.1979).
Hunt holds that a hospital is bound to exercise the degree of care toward a patient that his or her condition requires, which must be determined under the particular facts and circumstances. Hunt questioned a community standard of care in the case of hospital negligence. Bryant concluded that determination of negligence on the part of a hospital does not require establishment of a community standard of care.
Butts v. Watts, 290 S.W.2d 777 (Ky.App. 1956) held that expert testimony in a malpractice action is unnecessary where the common knowledge of laymen is sufficient to infer negligence from the facts. Despite lack of expert evidence, failure to attend a patient is not reasonable care, when the circumstances show the serious consequences of that failure. Thomas v. Corso, 265 Md. 84, 288 A.2d 379 (1972).
In some medical malpractice cases, expert testimony to establish a standard of care is unnecessary. When a physician does an obviously negligent act, such as fracturing a leg during an examination;[16] amputating the wrong arm; carelessly dropping a knife, scalpel, or acid on a patient;[17] or leaving a sponge in a patient's body,[18] lay persons can infer negligence. Failure to furnish medical care to a patient with a serious head injury for a period of two hours can be judged by a common *720 sense standard. Hammond v. Grissom, 470 So.2d 1049 (Miss.1985). Similarly, the failure of an on-call physician to respond to a hospital emergency, when he knew or should have known his presence was necessary, is obviously negligence. Thomas v. Corso, supra.

CAUSATION
Despite the fact that the wounds were one cause in fact of Cedric's death, there can be more than one cause in fact making both wrongdoers liable. See Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962); Anthony v. Hospital Service Dist. No. 1, 477 So.2d 1180 (La.App. 1 Cir.1985), writ den. 480 So.2d 743; and Thomas v. Corso, supra.
Once a breach of duty constituting malpractice is established, the question of whether the malpractice contributed to the death, i.e., lessened the chance of survival, is a question of fact for the jury. Anthony, supra; Hernandez v. Clinica Pasteur, Inc., 293 So.2d 747 (Fla.App.1974). A substantial factor need not be the only causative factor; it need only increase the risk of harm. Jones v. Montefiore Hospital, 494 Pa. 410, 431 A.2d 920 (1981). Jones relied on Restatement (Second) of Torts, § 323 (1965).[19]
In Harvey v. Silber, 300 Mich. 510, 2 N.W.2d 483 (1942), the patient died of internal hemorrage following a bullet wound through the abdomen. There was a probability that an operation would have saved his life, and the negligence of the attending doctors in making an inaccurate diagnosis was held to be a proximate cause of the death.
It is not necessary to prove that a patient would have survived if proper treatment had been given, but only that there would have been a chance of survival. Destruction of a two percent chance of survival has been held to present a jury question as to causation. Kallenberg v. Beth Israel Hospital, 357 N.Y.S.2d 508, 45 App.Div.2d 177 (1974), aff'd 37 N.Y.2d 719, 374 N.Y.S.2d 615, 337 N.E.2d 128 (1975). See Carr v. St. Paul Fire & Marine Insurance Company, 384 F.Supp. 821 (1974); Whitfield v. Whittaker Memorial Hospital, 210 Va. 176, 169 S.E.2d 563 (1969); and Hicks v. United States, 368 F.2d 626 (4 Cir.1966).
In Carr, plaintiff's decedent went to the hospital complaining of severe pain and vomiting with a medical history of diabetes. He was refused treatment or examination by a physician and returned to his home where he died that evening. The cause of death was an acute myocardial infarction, arteriosclerosis secondary to diabetes. There was testimony that the patient's chances of survival would have been increased or enhanced by a physician's care. Carr held that, since a plaintiff cannot show to a certainty that a patient would have lived had he been hospitalized or a doctor called, a hospital is responsible for failure to furnish the care and attention reasonably required by the patient's condition.
Whitfield decided that conjectures as to the likelihood of survival are inadmissible when a surgeon's negligent inaction has terminated any chance of survival. A doctor, who destroys any possibility of survival, is responsible because plaintiffs cannot prove to a certainty what would have happened had prompt medical care been given.
Hicks also held that a physician is answerable for destroying any substantial possibility of life, because it is impossible to show with certainty what might have happened.
Defendant's conduct must increase the risk of a patient's harm to the extent of being a substantial factor in causing the result but need not be the only cause. Roberson v. Counselman, 235 Kan. 1006, 686 P.2d 149 (1984). Failure to afford a patient treatment which would have given him a *721 forty percent chance of survival can be a substantial factor/cause for his death. Roberson, supra.
Reasoning that doctors and hospitals should not be released from negligence liability because a patient had less than a fifty percent chance of survival, Herskovits v. Group Health Co-op.[20] followed the rationale of Hamil v. Bashline[21] to hold that a negligent act or omission, which increases the risk of harm, presents a jury question: was the increased risk a substantial factor in producing the fatal result? Although patient Herskovits had less than a fifty percent chance of survival at the time of the malpractice and that chance was only reduced by fourteen percent, the court concluded that the issue of causation should have gone to the jury.
"Thus, in a death case, if a defendant physician, by action or inaction, has destroyed any substantial possibility of the patient's survival, such conduct becomes a proximate cause of the patient's death. The law does not require the plaintiff to prove to a certainty that the patient would have lived had he received more prompt diagnosis and treatment for the condition causing the death." Brown v. Koulizakis, 229 Va. 524, 331 S.E.2d 440 at 446 (1985).
As a result of Dr. Gerdes's failure to obtain another surgeon and Dr. McCool's failure to operate, Cedric had no chance of living. Requiring his survivors to prove that surgery would have saved him would be an unreasonable burden. Hunter v. Office of Health Services, Inc., 385 So.2d 928 (La.App. 2 Cir.1980), writ den. 393 So.2d 737.

RESPONDEAT SUPERIOR
Roberts v. State, Through La. Health, etc., 404 So.2d 1221 (La.1981) and Blanchard v. Ogima, 253 La. 34, 215 So.2d 902 (1968) hold that the factor of control is the key to employee status for purposes of respondeat superior.
Suhor v. Medina, 421 So.2d 271 (La.App. 4 Cir.1982) held that whether an emergency room physician is an employee or an independent contractor is a factual issue turning on the control exercised by the hospital over his activities.[22]
In a similar Maryland case, Thomas v. Corso, 265 Md. 84, 288 A.2d 379 (1972), plaintiff Corso was brought to a hospital emergency room at 11:10 P.M. after being hit by an automobile. The attending nurse called Dr. Thomas, who was on-call, at 11:25 P.M. Dr. Thomas, asleep at home some ten minutes from the hospital, was a general surgeon who was required to be available to handle surgical emergencies. He instructed nurse Halter to admit Corso as a patient, but did not come to the hospital until 2:30 A.M. when he pronounced Corso dead of traumatic shock, a fractured femur and pelvis. Dr. Thomas admitted that Corso had definitely needed a physician's attention. According to the attending nurse, an on-call doctor generally comes to the hospital to look at an emergency room patient who has been struck by an automobile. Dr. Thomas testified that he might have arrested the shock if he had received a later call giving Corso's deteriorating vital signs. The hospital was responsible for the doctor's failure to comply with his staff duty to respond to emergency calls. Also see Cooper v. National Motor Bearing Company, 136 Cal.App.2d 229, 288 P.2d 581, 51 A.L.R.2d 963 (1955).

CONCLUSION
Both LSA-R.S. 40:2113.4 and the Baton Rouge General Hospital Bylaws require that emergency services be rendered to all patients in the territorial area. The hospital *722 bylaws also require the doctor on emergency call to see anyone for whom he is called or arrange for other care. The bylaws provide that no patient shall be transferred without due consideration for his condition and the facilities existing for his care. According to the bylaws, the emergency room physician on duty is required to notify the chief of the hospital's service when a doctor refuses a call. Although Dr. Gerdes was unaware that he was required to notify the chief of the service when Dr. McCool refused the call, he was responsible under his contract with the hospital to perform that duty.
A reasonable juror could have concluded that Dr. Gerdes' failure to notify the chief of the service in order that another surgeon could treat Cedric Hastings was a contributing factor in his death. Between 12:25 A.M. when Dr. McCool was contacted and 1:30 A.M. when Cedric was strapped into the ambulance, an hour and five minutes elapsed in which another doctor could have been summoned to the scene. Both Dr. Gerdes and the hospital are liable for this breach of duty by Dr. Gerdes, who was performing a service which the hospital was required to make available and who functioned under the control of the hospital's rules and regulations as well as its medical staff.
A reasonable juror could also have concluded that Dr. McCool was negligent in not obtaining further information about Cedric's condition, in not going to the hospital to examine him in person, and in disregarding his duty to the public and the hospital as a physician on-call, apparently for economic reasons.
Here, there is no necessity for expert evidence about the standard of care required from the hospital, the emergency room physician, and the physician on-call, because the standards are clearly delineated in the statutes and the bylaws of the hospital. In addition, the need for a thoracotomy on Cedric Hastings was established by the testimony of Dr. Gerdes, Dr. McCool and nurse Kelly. Even the ambulance driver realized that the patient was in no condition to be moved. Plaintiffs are not required to shoulder the impossible task of proving that surgery would have saved Cedric Hastings' life. It was only necessary to show a reasonable probability that the procedure would have been life saving in these circumstances.
The policy of Baton Rouge General Hospital was to furnish emergency service regardless of a patient's insurance or ability to pay and not to transfer an unstable patient. Since Cedric Hastings was medically unfit for transfer, his attempted transfer was a violation of the hospital's policy. Since hospitals act through their staff physicians and regulate those physicians' behavior relative to emergency service, the hospital is responsible for any derelictions by the two physicians.
Defendants rely heavily on LSA-R.S. 9:2794.[23] However, that statute does not *723 apply when the thing speaks for itself, i.e., res ipsa loquitur. Here, not only the sequence of events, but the physicians themselves, establish at least an inference of negligence. In the ordinary course of events, a man does not bleed to death in a hospital emergency room over a two and one-half hour period without some surgical intervention to save his life.
Since reasonable people could disagree as to whether there were negligent breaches of duty by Dr. Gerdes and Dr. McCool, which were causal factors in the death of Cedric Hastings, and whether any negligence of the physicians is attributable to the hospital, the trial court erred in granting a directed verdict for the defendants.

DECREE
For the foregoing reasons, the judgment of the court of appeal is reversed, and the matter is remanded to the trial court for trial on the merits.
REVERSED AND REMANDED.
DENNIS, J., concurs.
CALOGERO and MARCUS, JJ., concur for reasons assigned by HALL, J.
HALL, J., concurs with reasons.
COLE, J., concurs with respect to defendant, Dr. Edward McCool, and dissents as regards the remaining defendants.
HALL, Justice Ad Hoc, concurring.
The evidence presented by plaintiffs was sufficient to preclude the granting of a directed verdict on any of the merit issues, including negligence of the two physicians, responsibility of the hospital for the actions of the physician, and causation. Determination of these issues cannot be made on this appeal based on the record before us, but should be made only after the case is fully tried and decided by the trier of fact on remand. To the extent that the majority opinion purports to determine any of the merit issues, such as the negligence of Dr. Gerdes and the liability of the hospital, such determinations are premature.
NOTES
[*] Pike Hall, Jr., Chief Judge of the Court of Appeal, Second Circuit, participated in this decision in place of Lemmon, J.
[1] David Hastings and Audrey Hastings.
[2] Tr. 107.
[3] Tr. 107.
[4] Tr. 107.
[5] This particular case was investigated by the emergency medical service's committee.
[6] "Section J. Emergency Service Committee

"The Emergency Service Committee shall be composed of not less than seven members of the Active Medical Staff appointed annually by the Chief of Staff. These members shall be the chiefs (or their designated representatives) of Internal Medicine, General Surgery, Pediatrics, Orthopedics and General Practice, Emergency Care physician and Dental Surgery, the latter to be appointed by the Chief of Dental Surgery. This committee shall be responsible for the emergency service." (Exhibit P-3)
[7] P-2.
[8] Hastings v. Baton Rouge General Hosp., 486 So.2d 190 (La.App. 1 Cir.1986).
[9] 490 So.2d 275 (La.1986).
[10] LSA-C.C.P. art. 1810 provides:

"A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury."
"B. For purposes of this Section, `emergency' means a physical condition which places the person in imminent danger of death or permanent disability,...."
[11] LSA-R.S. 40:2113.4 provides in pertinent part:

"A. Any general hospital licensed under this Part, which is owned or operated, or both, by a hospital service district, which benefits from being financed by the sale of bonds that are exempt from taxation as provided by Louisiana law, or which receives any other type of financial assistance from the state of Louisiana and which offers emergency room services to the public and is actually offering such services at the time, shall make its emergency services available to all persons residing in the territorial area of the hospital regardless of whether the person is covered by private, federal Medicare or Medicaid, or other insurance. Each person shall receive these services free from discrimination based on race, religion, or national ancestry and from arbitrary, capricious, or unreasonable discrimination based on age, sex, or physical condition and economic status. However, in no event shall emergency treatment be denied to anyone on account of inability to pay. Any such hospital found to be in violation of this Section shall not receive any client referrals from the Department of Health and Human Resources.
[12] LSA-R.S. 40:1299.41 A. (7) and (8) provides:

"A. As used in this Part:
* * * * * *
"(7) `Tort' means any breach of duty or any negligent act or omission proximately causing injury or damage to another. The standard of care required of every health care provider, except a hospital, in rendering professional services or health care to a patient, shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill. "(8) `Malpractice' means any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, and also includes all legal responsibility of a health care provider arising from defects in blood, tissue, transplants, drugs and medicines, or from defects in or failures of prosthetic devices, implanted in or used on or in the person of a patient. * * *"
[13] Exhibit P-2.
[14] The policy reflected in these by-laws was in effect at the time of the accident, according to Silvey's testimony.
[15] Exhibit P-7.
[16] Boxberger v. Martin, 552 P.2d 370 (Okla. 1976).
[17] Johns Hopkins Hospital v. Genda, 255 Md. 616, 258 A.2d 595 (1969).
[18] Chappetta v. Ciaravella, 311 So.2d 563 (La. App. 4 Cir.1975); Druilhet v. Comeaux, 317 So.2d 270 (La.App. 3 Cir.1975); Guilbeau v. St. Paul Fire & Marine Insurance Co., 325 So.2d 395 (La.App. 3 Cir.1976); Rural Educational Association v. Bush, 42 Tenn.App. 34, 298 S.W.2d 761 (1956); and Frederickson v. Maw, 119 Utah 385, 227 P.2d 772 (1951).
[19] Restatement (Second) of Torts, § 323 (1965) provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
"(a) his failure to exercise such care increases the risk of such harm, or
"(b) the harm is suffered because of the other's reliance upon the undertaking."
[20] 99 Wash.2d 609, 664 P.2d 474 (1983).
[21] 481 Pa. 256, 392 A.2d 1280 (1978).
[22] Distinguished in Suhor was Badeaux v. East Jefferson Gen. Hospital, 364 So.2d 1348 (La.App. 4 Cir.1978) where plaintiff relied on an allegation that the two attending emergency room physicians were agents of the hospital and introduced no evidence to counter defendants' affidavits that the emergency room physicians were independent contractors. In the absence of affidavits as to any control and supervision by the hospital, summary judgment in favor of the hospital was affirmed.
[23] LSA-R.S. 9:2794 provides:

"A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., a dentist licensed under R.S. 37:741 et seq., or a chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:
"(1) The degree or knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the allege acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, or chiropractic physicians within the involved medical specialty.
"(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
"(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
"B. Any party to the action will have the right to subpoena any physician, dentist or chiropractic physician for a deposition and/or testimony for trial to establish the degree of knowledge or skill possessed or degree of care ordinarily exercised as described above without obtaining the consent of the physician, dentist or chiropractic physician who is going to be subpoenaed. The fee of the physician, dentist or chiropractic physician called for deposition and/or testimony under this Section will be set by the court.
"C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden or proving, by a preponderance of the evidence, the negligence of the physician, dentist or chiropractic physician. The jury shall be further instructed that injury alone does not raise a presumption of the physician's, dentist's, or chiropractic physician's negligence. The provisions of this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable."