540 So.2d 1270 (1989)
Troy PARKER, et ux, Individually and on Behalf of the Minor, Leigh Ann Parker, Plaintiffs-Appellants,
v.
SOUTHWEST LOUISIANA HOSPITAL ASSOCIATION d/b/a Lake Charles Memorial Hospital, Defendant-Appellee.
No. 87-1302.
Court of Appeal of Louisiana, Third Circuit.
March 15, 1989.
*1271 Russell T. Tritico, Lake Charles, for plaintiffs-appellants.
Raggio, Cappel, Chozen & Berniard, Richard B. Cappel, Lake Charles, for defendant-appellee.
Before DOMENGEAUX, FORET and YELVERTON, JJ.
FORET, Judge.
Troy and Greer Parker, plaintiffs-appellants herein, instituted this medical malpractice action, individually and on behalf of their minor daughter, Leigh Ann Parker, against Southwest Louisiana Hospital Association, d/b/a Lake Charles Memorial Hospital (Memorial). The Parkers appeal from a jury verdict rendered in favor of Memorial. The Parkers contend that the jury erred in finding that Memorial was not guilty of any negligence or fault which was the proximate cause of their daughter's injuries and ensuing death. We do not find that the jury was clearly in error in finding no negligence on behalf of Memorial and thus, we affirm the judgment of the trial court.

BACKGROUND
Leigh Ann Parker was born at 3:47 P.M. on April 19, 1983. From birth, until she was found in cardiopulmonary arrest at 4:35 P.M. on April 20, 1983, Leigh Ann exhibited all the signs of a perfectly normal "well baby."
When Leigh Ann was found in cardiopulmonary arrest, the nursery nursing staff on duty immediately began resuscitation efforts. Although efforts to revive Leigh Ann were successful, she sustained severe brain damage and ultimately died on January 4, 1986.

PLAINTIFFS' CONTENTIONS
The Parkers do not contend that Leigh Ann's pre-arrest condition and status were incorrectly assessed; neither do they contend that her subsequent arrest was predictable or preventable.
The Parkers' main contention is that the nursery staff at Memorial was negligent in failing to discover Leigh Ann in distress within sufficient time to prevent severe brain damage. Additional allegations against Memorial set forth in the Parkers' petition for damages are as follows:
"a. In failing to properly staff the nursery;
b. In failing to adequately train the nursery staff;
c. In failing to adequately monitor the nursery staff;
d. In failing to properly and expeditiously begin resuscitation;
e. In failing to properly intubate the child;
f. In failing to call for "Code Blue" immediately as the child was found to be in distress;
g. In allowing the nursery to be monitored by only one person, who was not located in a position where he could properly monitor the remaining children (the rest being delivered to the mothers for feeding);
h. In allowing the child to be in a position that it would likely choke;
i. In failing to exercise due care in accordance with recognized standards."

EVIDENCE
The evidence revealed that on April 20, 1983, three nurses, Julie Boyle, Darlene Lavinco, and Marla Godeaux, were on duty *1272 in the Memorial nursery. They came on duty between 2:45 P.M. and 3:00 P.M., at which time all of the "well babies" were bathed and changed and their cribs were stocked. Leigh Ann was bathed between 3:30 P.M. and 4:00 P.M., at which time all indications were that she was perfectly normal.
There were two nurses in the "well baby" nursery to care for fifteen babies. Nurse Godeaux testified that this was well within the standard ratio of staff to "well babies", and there was no evidence presented to the contrary. The "well baby" nursery was divided into Sections A and B, with Leigh Ann being in Section B. Nurses Lavinco and Boyle, assigned to the "well babies", would both circulate between the two sections in taking care of the babies. Nurse Godeaux testified that she was in charge of monitoring an infant in the nursery intensive care unit (NICU).
A few moments before 4:30 P.M., Terry Boyle (husband of Nurse Julie Boyle), also a registered nurse and Memorial's health supervisor, came by the nursery on his rounds. Nurses Lavinco and Boyle were in the nursery at this time preparing to deliver the babies to their mothers for the 5:00 P.M. feeding. They asked Terry if he would sit at the nurse's station to monitor the telephone and any visitors who came to the nursery. Additionally, Terry was responsible for listening to the monitors on the infant in the nursery intensive care unit.
Because the infant in NICU was stable, Nurse Godeaux was able to help Nurses Lavinco and Boyle deliver the infants to their mothers, beginning at 4:30 P.M. She testified that on April 20, 1983, she had delivered her first baby to its mother and returned to Section B of the nursery within three to five minutes. When she entered the nursery, Nurse Lavinco was in Section A. Additionally, Nurse Terry Boyle was seated at the nurse's station. As Nurse Godeaux was on her way to the sink in Section B to wash her hands before picking up another baby to deliver, she noticed Leigh Ann's color was not right and that the infant was face down. She immediately picked up Leigh Ann, called for Nurse Lavinco's help, and they began resuscitation efforts. During this time, Nurse Julie Boyle returned and intubated Leigh Ann. Intubation consists of placing a tube in the infant's trachea so that the infant can receive oxygen. Within seven minutes of Nurse Godeaux's finding Leigh Ann, Dr. Vanchiere arrived and re-intubated Leigh Ann.
Nurse Lavinco testified that between 4:30 P.M. and 4:35 P.M. she observed the babies in Nursery B, including Leigh Ann, while washing her hands in Nursery A. At the time Nurse Godeaux observed Leigh Ann in distress and called for help, Nurse Lavinco was standing at the door of Nursery A with a baby in her arms. She was waiting for another nurse to return to the nursery so that she could deliver a second baby for feeding. Although there was no direct evidence as to the last time Leigh Ann was individually observed prior to 4:30 P.M., all three nurses were in the nursery before delivery of the babies began at 4:30 P.M.
Essentially, the Parkers contend that the nursing staff at Memorial was negligent in leaving the nursery unattended while the babies were being delivered to their mothers. They claim that Leigh Ann was inadequately monitored and/or observed and that Memorial's accepted standard of care regarding observation, which would allow an infant to go unobserved for a period of six to eight minutes, sufficient time to allow it to sustain permanent brain damage in the event of cardiopulmonary arrest, was below a reasonable standard of care.
The Parkers attempted to show that at the time of the incident only Nurse Terry Boyle was in the nursery, seated at the nurse's station. Within this contention, the Parkers allege that Nurse Terry Boyle was solely responsible for the remaining infants in the "well baby" nursery insofar as the three on-duty nurses were delivering infants to their mothers.
Dr. William Gill, chief of the Neonatology section of the Department of Pediatrics at Tulane Medical Center, testified on behalf *1273 of the Parkers. Dr. Gill found that the care for Leigh Ann would have been of a substandard nature if Nurse Terry Boyle, seated at the nurse's station, put himself in a position where he could not see Leigh Ann and was solely responsible for her care. He also testified that if, while the nurses on duty delivered the infants to the mothers, a nurse remained in the nursery observing the infants, that there would be no substandard care or conduct on behalf of the nurses. Without the necessary finding that the infants were left unattended, a reasonable juror could, without error, find that the nursing staff at Memorial acted well within the accepted standard of care.
Nurse Godeaux testified that Memorial's policy was to have a minumum of one person in the nursery at all times and that there was an unwritten policy at the hospital to visually observe each infant every ten to fifteen minutes. Additionally, she testified that when delivering the babies to their mothers for feeding, one of the three nurses, either Lavinco, Godeaux, or Julie Boyle, would wait for another nurse to return before delivering a baby in order to assure that a nurse was in the nursery at all times.
In reviewing the testimony of the three nurses on duty at the time of the incident, a reasonable juror could have concluded that there was a nurse, other than Terry Boyle, in the nursery at all times. The jury could have found that the three on-duty nurses remained responsible for the "well babies" remaining in the nursery while Nurse Terry Boyle was primarily responsible for monitoring the phones, taking care of any nursery visitors, and assuming responsibility for the infant in the nursery intensive care unit.
Therefore, the pivotal issue before this Court is whether or not Memorial's policy of individually observing each infant at intervals of ten to fifteen minutes was below an accepted standard of care.
The medical evidence presented by both parties demonstrates that infants do often quit breathing (an apneic episode) for no apparent reason, only to begin again under their own power or with mild stimulation such as a pat on the back, or a touch. Conversely, the evidence clarified that an apneic episode with tragic results, such as in this case, is a very rare event. Sudden Infant Death Syndrome (S.I.D.S.) deaths or apneic episodes occur in 2 to 3 infants per 1,000 live births. Of these 2 to 3 infants per 1,000, 91% of S.I.D.S. deaths occur in infants three weeks to six months of age. Of the remaining 9% of S.I.D.S. deaths, most occur after six months of age. Only 1 to 2 infants out of every 100,000 S.I.D.S. cases occur within twenty-five hours of birth. Therefore, although apnea is not uncommon in infants, it is very, very rare that the condition does not resolve itself and even rarer, in an infant of Leigh Ann's age.
Even rarer than S.I.D.S. are cases of complete cardiac arrest, where the heart stops and brain damage may occur within two to three minutes. Dr. Goldsmith, a practicing physician in Pediatrics and Neonatology at the Oschner Clinic in New Orleans, testifying for Memorial, stated that the facts of this case point to a diagnosis of cardiac arrest rather than an apneic episode or S.I.D.S. But Dr. Goldsmith also agreed that apnea is more common than cardiac arrest. He testified that he had seen only one case like this in eleven years at Oschner. Likewise, Nurse Godeaux testified that in her nursing experience she had never had an incident like this occur in a "well baby."
In summary, the medical evidence presented reveals that Leigh Ann may have sustained severe brain damage within six to eight minutes if her distress was caused by apnea and within fewer minutes if her distress was caused by cardiac arrest. Although the medical evidence presented highlights the fact that there can be no medical certainty as to what caused Leigh Ann's distress, the statistical probability is that Leigh Ann suffered an apneic episode, also referred to as a near miss sudden infant death syndrome (S.I.D.S.). During an apneic episode, an infant may show no visible signs of distress during the first several minutes. Therefore, an infant would have to be visually observed every *1274 four to six minutes in order to prevent all possibility of brain damage in the event of an apneic episode. Essentially, according to the Parkers' arguments, a nurse would have to be circulating throughout the nursery at all times, visually observing each infant at four to six minute intervals in order to be certain to detect an infant exhibiting observable signs of distress.[1]
As to Memorial's standard of care in observing the infants, all three nurses testified that it was Memorial's policy to observe each infant at no less than ten to fifteen minute invervals. The national guidelines established by the American Academy of Pediatrics were introduced in connection with plaintiffs' expert, Dr. Gill's testimony. These guidelines state that the observation of infants should be continuous contingent with the care plan established by the individual nursery. Dr. Gill additionally testified that Memorial's care plan, i.e., a standard of checking the infants at least every ten to fifteen minutes, was acceptable.
Although Dr. Gill did not treat Leigh Ann, he agreed with the medical experts called by Memorial, that the most probable causes of the incident were either cardiac arrest (abnormal rhythm) or an apneic episode (not breathing). He testified that if Leigh Ann suffered from cardiac arrest, the onset of hypoxia (lack of oxygen) may be instantaneous, with the infant turning blue within sixty to ninety seconds. Conversely, if Leigh Ann's injury resulted from an apneic episode, it may be three minutes before the onset of cyanosis (blue color) and six to eight minutes from onset of insult to the beginning of terminal apnea. He testified that Leigh Ann was found early in the terminal stages of an apneic episode. Again, he conceded that a hospital standard of observing the infants at ten to fifteen minute intervals was in compliance with national guidelines and more so, a policy of observing the infants every twenty, twenty-five, or even thirty minutes would be within these guidelines. He also conceded that the Memorial nurses could have been well within acceptable standards and Leigh Ann's apneic episode could have still occurred.
Therefore, the evidence supports the jury's finding that Memorial did not breach any duty owed to Leigh Ann and, as such, was not negligent. A reasonable juror could have found that the nursery was staffed at all times; that Nurse Lavinco was in the nursery at the time Leigh Ann was found; and that Nurse Godeaux found Leigh Ann after an absence from the nursery of three to five minutes. Additionally, all of the medical testimony on behalf of both Memorial and the Parkers supported the hospital's policy of circulating throughout the nursery observing each infant individually at intervals of ten to fifteen minutes as well within any known and accepted standard of care.
Dr. Gill also agreed that there was no forewarning that Leigh Ann was in any danger of experiencing cardiac arrest or an apneic episode. He had no criticism of the staffing at Memorial nor of Leigh Ann's pre-arrest or post-arrest treatment. As this was the only evidence presented by the Parkers as to their allegations that Memorial (1) failed to properly staff the nursery; (2) failed to adequately train the nursing staff; (3) failed to adequately monitor the nursing staff; (4) failed to properly and expeditiously begin resuscitation; and (5) failed to call for "Code Blue" immediately when Leigh Ann was found to be in distress, a reasonable juror could have found that these allegations were without merit.
The Parkers additionally allege that the Memorial nursing staff failed to properly intubate Leigh Ann during the resuscitation effort. The Parkers argued that Leigh Ann's injuries were increased because the endo-tube was placed in the esophagus rather than the trachea. The evidence did not clearly show that the endotube was improperly placed or that conversely, *1275 in the event that it was improperly placed, that this would have made any significant difference in the extent of Leigh Ann's injuries. The testimony revealed that a physician will often reinsert an endotube in an emergency due to the difficulty of ascertaining whether the tube is placed properly before taking x-rays. The evidence was also clear that Leigh Ann responded rapidly after she was intubated by Nurse Boyle; her color improved and her heart rate increased. Dr. Gill, the Parkers' expert physician, testified that the endotube was, most probably, in the correct position when originally inserted by Nurse Boyle. Therefore, a reasonable juror could have found this allegation to be without merit.
The Parkers additionally allege that the Memorial nursing staff was negligent in allowing Leigh Ann to be in a position where she could easily choke. This allegation is based upon a typed notation found in Leigh Ann's chart wherein it was stated that she was not found lying on her abdomen. This notation, which was later corrected, was adequately explained as a typographical transcription error. The testimony presented and the original nurse's handwritten notes clearly state that Leigh Ann was found lying on her abdomen. Therefore, a reasonable juror could have accepted this version of the facts and found this allegation to be without merit.

HOSPITAL'S LIABILITY
"A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect the patient from dangers that may result from the patient's physical and mental incapacity as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and the facts of that case."

Hunt v. Bogalusa Community Medical Center, 303 So.2d 745, 747 (La.1974).
This standard of care does not require the establishment of a "community standard" before determining whether a hospital has been negligent. In discussing the standard of care utilized in determining a hospital's negligence, the Louisiana Supreme Court, in Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 719 (La. 1986), stated:
"Hunt [v. Bogalusa Community Medical Center, 303 So.2d 745 (La.1974) ] [supra] holds that a hospital is bound to exercise the degree of care toward a patient that his or her condition requires, which must be determined under the particular facts and circumstances. Hunt questioned a community standard of care in the case of hospital negligence. Bryant [Bryant v. St. Paul Fire & Marine Ins. Co., 365 So.2d 537 (La.App. 3 Cir.1978), writ refused, 367 So.2d 1184 (La.1979)] concluded that determination of negligence on the part of a hospital does not require establishment of a community standard of care."
In this case, Memorial had a duty to provide Leigh Ann the amount of care that her condition required. Leigh Ann was a "well baby", twenty-five hours old when the arrest occurred. This fact is undisputed. Leigh Ann's mother, Greer Parker, testified that Leigh Ann could have been taken home any time after twenty-four hours of age; the parents were merely waiting until Greer was ready before taking Leigh Ann home. Dr. Gill, plaintiffs' expert medical witness, testified that if Mrs. Parker had taken Leigh Ann home before the event, it would have been unrealistic to advise her to check on Leigh Ann every six to eight minutes. Therefore, there is no evidence that Leigh Ann necessitated any level of care above that generally observed in the "well baby" nursery.
"In a medical malpractice action against a hospital, the plaintiff must prove, as in any negligence action, that the defendant owed the plaintiff a duty to protect against the risk involved, that the defendant breached that duty, that the plaintiff suffered an injury, and that the defendant's actions were a substantial cause in fact of the injury."
*1276 Smith v. State Through Dept. HHR, 523 So.2d 815, 819 (La.1988).
Recently, in Berry v. Rapides General Hospital, Inc., 527 So.2d 583, 585 (La.App. 3 Cir.1988), we discussed the duty of a hospital to its patients and the limitations on this duty:
"Thus, the mere fact that an accident happens or an injury occurs does not raise a presumption or inference of negligence on the part of the hospital. Musso v. St. Mary Parish Hospital Service, 345 So.2d 129 (La.App. 1 Cir.1977), writ denied, 347 So.2d 262 (La.1977). The hospital is not an insurer of a patient's safety and is not required to guard against or take measures to avert risks which a reasonable person under the circumstances would not anticipate as likely to occur. Williams v. Sisters of Incarnate Word, Etc., 341 So.2d 1299 (La.App. 3 Cir.1977)."
To establish malpractice in this case, the Parkers must prove by a preponderance of the evidence that one or more of the nursery staff at Memorial performed in a substandard way so as to violate the customarily accepted standard of care. Both the Parkers and Memorial presented expert medical testimony. Absolutely no evidence was presented to show that Memorial's policy of checking on each infant at intervals of ten to fifteen minutes violated the acceptable standard of care owed to plaintiffs. There is no evidence that Leigh Ann was left unobserved in excess of this amount of time.
After reviewing the testimony and evidence of both parties, we cannot say that the jury erred in finding that Memorial was not negligent in its care of Leigh Ann Parker.
For the foregoing reasons, we find that the jury did not err in its finding that Memorial was not negligent in its care of Leigh Ann Parker. Accordingly, we affirm the trial court's judgment in favor of SOUTHWEST LOUISIANA HOSPITAL ASSOCIATION, d/b/a LAKE CHARLES MEMORIAL HOSPITAL.
Costs of this appeal are to be paid by Troy and Greer Parker.
AFFIRMED.
NOTES
[1] Additionally, we note that Dr. Goldsmith testified that Leigh Ann was still experiencing continuing brain damage thirty minutes after arrest and resuscitation. Therefore, the extent of Leigh Ann's brain damage is not alone determinative or indicative of the period of time she was left unobserved.