612 So.2d 908 (1993)
Victor NELSON
v.
PENDLETON MEMORIAL METHODIST HOSPITAL and Lucius Clay Andrews, M.D.
No. 91-CA-2735.
Court of Appeal of Louisiana, Fourth Circuit.
January 14, 1993.
Writ Denied April 2, 1993.
C. Joseph Murray, New Orleans, for plaintiff/appellant.
Susan Northrop Ryan, Lemle & Kelleher, New Orleans, for defendants/appellees.
Before SCHOTT, C.J., and KLEES and WALTZER, JJ.
WALTZER, Judge.
This is an appeal from a May 1, 1991 judgment in conformity with the jury verdict in favor of the defendant, Dr. Lucius Clay Andrews, and against the plaintiff, Victor Nelson dismissing his action in malpractice. From that judgment, plaintiff appeals.
Sixteen year old Victor Nelson was involved in an automobile accident on September 16, 1984. He was taken to the Emergency Room (hereinafter "ER") at Pendleton Memorial Methodist Hospital (hereinafter "Pendleton") where he was treated by Dr. Lucius Clay Andrews, the ER physician, for a fractured rib, contusions, and a gash to the left leg. The blood pressure tests taken at the Emergency Room (hereinafter "ER") were abnormally high. Two blood pressure readings are normally taken at the ER, but the ER physician, Dr. Andrews, requested that a third be taken because of plaintiff's abnormally high pressure readings. The pressure readings recorded on the emergency record indicate that they were trending downward.
At this point, the testimony diverges. Dr. Andrews and ER Nurse Phyllis Levatta testified that Vincent Nelson was told to have his high blood pressure checked out by a physician on his post emergency room follow-up visit to his private physician. Dr. Andrews and Nurse Levatta both testified that while they do not have an independent memory of this particular sequence of events, it was their habit and the policy of the ER that any notice that blood pressure should be checked was given to the patient by the nurse at the time that the blood pressure was taken, that the Doctor would so inform the patient when he saw him, and that the nurse would so inform the patient and/or his family at the time that the After Care Instruction sheet was signed. Victor Nelson, his mother Dolise Nelson, and his grandmother Alice Weaver[1] testified that they were not informed that Vincent's blood pressure should be checked. The *909 After Care Instruction sheet given to Alice Weaver and signed by Dr. Andrews, Nurse Levatta and Alice Weaver did not specifically say that Vincent should have his blood pressure checked, rather the form stated as follow-up care to contact Vincent's private doctor or Dr. Spizer. Dr. Spizer was Vincent's private physician.
In February of 1985, approximately five months after the September 1984 accident, Vincent collapsed and was admitted to Charity Hospital in New Orleans. At that time his condition was diagnosed as end-stage kidney failure. He was placed on emergency dialysis. Vincent now undergoes dialysis three times per week and will continue to do so for the rest of his life, unless he undergoes a successful kidney transplant. His hopes of undergoing a successful transplant at this time are not the best as he has already undergone one transplant surgery which was not successful.
Plaintiff filed a malpractice action against Dr. Lucius Clay Andrews, the emergency room physician at Pendleton, alleging that if he had been warned to have his blood pressure checked at the time of the accident, then the underlying cause of his end-stage renal failure would have been detected and he could have had that cause treated, thus either delaying the disease or entirely preventing the end-stage renal failure. The plaintiff further argued that Dr. Andrews failed to so warn him and that his failure to warn constituted malpractice.
The case was heard by a jury of twelve men and women. The jury was provided with a series of interrogatories. The jury answered interrogatories 1 and 1a and having done so, were instructed not to answer the rest of the interrogatories. Interrogatories 1 and 1a provide as follows: 1. Did Dr. Andrews deviate from the standard of care in the medical services he rendered to the plaintiff?
YES 2 NO 10 
1a. Do you find that the plaintiff suffered any injury as a result of the deviation from the standard of care by Dr. Andrews?
YES 2 NO 10 
If you have answered question 1 or 1a "YES", continue; If "NO" stop here.
Based upon the jury interrogatories, the trial court judge rendered judgment in favor of the defendant, Dr. Lucius Clay Andrews, and against the plaintiff, Victor Nelson, dismissing plaintiff's action with prejudice at plaintiffs' cost. From that judgment, plaintiff appealed.
On appeal, plaintiff raises essentially one specification of error:
1. The jury's finding that the defendant did not breach the standard of care in his treatment of Victor Nelson was clearly wrong.
The scope of appellate review on this matter is whether the trier of fact, in this case the jury, was manifestly erroneous in its factual determinations. Canter v. Koehring Co., 283 So.2d 716 (La. 1973); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Rosell v. ESCO, 549 So.2d 840 (La.1989).
Plaintiff argues that the jury erred in failing to award him for the "loss of a chance". In Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986) a thoracic surgeon ordered that a patient be transferred to a public hospital when he discovered that the patient did not have insurance. The transfer required that the patient be disconnected from life-saving equipment. Shortly after the disconnection he died. In Hastings, supra, the Supreme Court stated:
Despite the fact that the wounds were one cause in fact of Cedric's death, there can be more than one cause in fact making both wrongdoers liable. See Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962); Anthony v. Hospital Service Dist. No. 1, 477 So.2d 1180 (La.App. 1 Cir.1985), writ den. 480 So.2d 743; and Thomas v. Corso, [265 Md. 84, 288 A.2d 379 (1972)] supra.
Once a breach of duty constituting malpractice is established, the question of whether the malpractice contributed to the death, i.e., lessened the chance of survival, is a question of fact for the *910 jury. Anthony, supra; Hernandez v. Clinica Pasteur, Inc., 293 So.2d 747 (Fla.App.1974). A substantial factor need not be the only causative factor; it need only increase the risk of harm. Jones v. Montefiore Hospital, 494 Pa. 410, 431 A.2d 920 (1981). Jones relied on Restatement (Second) of Torts, § 323 (1965).
In Harvey v. Silber, 300 Mich. 510, 2 N.W.2d 483 (1942), the patient died of internal hemorrhage following a bullet wound through the abdomen. There was a probability that an operation would have saved his life, and the negligence of the attending doctors in making an inaccurate diagnosis was held to be a proximate cause of the death.
It is not necessary to prove that a patient would have survived if proper treatment had been given, but only that there would have been a chance of survival. Destruction of a two percent chance of survival has been held to present a jury question as to causation. Kallenberg v. Beth Israel Hospital, 357 N.Y.S.2d 508, 45 App.Div.2d 177 (1974), aff'd 37 N.Y.2d 719, 374 N.Y.S.2d 615, 337 N.E.2d 128 (1975). See: Carr v. St. Paul Fire & Marine Insurance Company, 384 F.Supp. 821 (1974); Whitfield v. Whittaker Memorial Hospital, 210 Va. 176, 169 S.E.2d 563 (1969); and Hicks v. United States, 368 F.2d 626 (4 Cir.1966). (emphasis supplied) (At 720).
In Smith v. State through Dept. HHR, 523 So.2d 815 (La.1988), the Supreme Court stated:
We granted the plaintiffs' application for a writ of review, 519 So.2d 107 (La. 1987), in order to consider the court of appeal's ruling on causation in light of our decision in Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La. 1986). Hastings held that in a wrongful death action involving allegations of medical malpractice, the plaintiff need not prove that the patient would have survived if the defendant had undertaken preventive or other methods of treatment. Instead, we held essentially that the plaintiff may establish a compensable claim through evidence which demonstrates that a defendant's malpractice resulted in the loss of a chance of survival of a patient who thereafter expired.
After reviewing the record in this case, we agree with the court of appeal and the trial court that the plaintiffs did not prove that negligence on the part of the defendants lessened Mrs. Smith's chances of survival or otherwise contributed to her death. While we adhere to the `loss of chance' standard described in Hastings, we find that the standard was not met here by plaintiffs, who presented little or no evidence that defendants caused the decedent to lose any chance of survival. (At 816).
On appeal plaintiff argues "Although there are no cases dealing with this issue other than in death cases, there is no reason in logic or in law which would change the result when the plaintiff has lost vital organs rather than his life. The "loss of a chance" doctrine applies equally to a chance of saving an organ as it does to the chance of saving a life." Plaintiff further notes that the Smith case, supra, approvingly cites Fairchild v. Brian, 354 So.2d 675 (La.App. 1st, 1977), which dealt with the loss of eyesight.
At the time that Vincent was admitted to Charity with end-stage renal failure, his kidneys were completely dead and destroyed. Because they were completely destroyed, all of the medical experts agree that it is impossible to determine the cause of the kidney failure.
The testimony indicated that there were numerous potential causes of Vincent's kidney failure. Vincent's kidney failure could have been caused by a pre-existing disease, by hypertension, by blockage of the urological tubes, by a kidney infection, by blunt trauma, by his body building, by unusually small kidney size, and as a side effect of a sexually transmitted disease.
Dr. Francisco Gonzales testified that 35% of Afro-Americans have hypertension or high blood pressure and many go on to have kidney failure. He further testified that in Louisiana, most Afro-Americans on dialysis are the result of long term untreated *911 blood pressure. This is the diagnosis that most fits the plaintiff's premise that untreated hypertension was the cause of the end-stage renal failure. This is further the diagnosis that most fits the plaintiff's causative chain premise, namely, if plaintiff had been timely warned, then hypertension would have been discovered and treated with the results that kidney failure would not have occurred.
Dr. David Spizer testified that prior to plaintiff's collapse in February 1985, plaintiff had been treated for urological problems, specifically penile discharge and pain on March 28, 1984. Plaintiff had a bacterial infection which was treated with penicillin and tetracycline.
Dr. Thomas Oelsner testified that based on plaintiff's edema in the year proceeding his collapse and due to the high amount of protein in his urine, plaintiff had pre-existing chronic glomerulonephritis, a kidney disease which caused the kidney failure. One of the symptoms of chronic glomerulonephritis is elevated blood pressure. He further testified that while symptoms can be treated, nothing can be done to stop the progress of the disease.
Dr. Efrain Reisin testified that Vincent had a history of intermittent swelling 1 or 2 years before he was seen by Dr. Reisin. Dr. Reisin testified that initially he thought that Vincent's body building may have brought on the renal failure via renomyolysis. Renomyolysis is rapid renal failure originated by a rapid destruction of muscle tissue. He also thought that Vincent may have had a chronic renal disease such as chronic glomerulonephritis or a chronic kidney infection. He did a cystogram test which ruled out the possibility of chronic kidney infection. He ruled out severe hypertension as a cause because there were no lesions in the eye grounds. He testified that lesions in the eye ground go with lesions in the kidneys in hypertension caused kidney destruction. He also ruled out hypertension because the EKG did not indicate any heart enlargement. Thus, Dr. Reisin concluded that hypertension was not the cause of Vincent's end stage renal failure and that Vincent probably had chronic glomerulonephritis.
Dr. Reisin testified that with the disease of glomerulonephritis there are antihypertensive medications which have no effect on the delay of the progress of the disease. They can control its symptoms, but they cannot delay it. He testified that end stage renal failure is inevitable. He further testified that the possibility of curing glomerulonephritis with hypertension is non-existent.
As discussed in Hastings, supra, the question of whether malpractice lessened the chance for survival is a question of fact for the jury. After a complete review of the record, we cannot conclude that the trier of fact, the jury, was manifestly erroneous in its factual determinations. Based on the testimony adduced, the jury could have easily found that Vincent was warned about the high blood pressure such that no malpractice was committed. They could have also found that whether or not he was warned, earlier treatment would have in no way arrested the progress of the disease; hence, there was no loss of a chance because there was no chance.
For the reasons discussed, the judgment of the district court is affirmed.
AFFIRMED.
NOTES
[1] Weaver testified that she did not speak to Dr. Andrews, Nurse Levatta or anyone else at the hospital relative to the After Care Instruction sheet. She did however receive the sheet.