647 So.2d 653 (1994)
Rachel SMITH, indiv., Plaintiff-Appellant,
v.
STATE of Louisiana, DHH, Defendant-Appellee.
No. 26,280-CA.
Court of Appeal of Louisiana, Second Circuit.
December 9, 1994.
Writ Granted March 10, 1995.
*656 Moore, Walters, Shoenfelt & Thompson by Oscar L. Shoenfelt and Marjorie Ann McKeithen, Baton Rouge, for appellant.
Hudson, Potts & Bernstein by Gordon L. James and Jan P. Christiansen, Monroe, for appellee.
Before SEXTON, NORRIS, JJ., and PRICE, J. Pro Tem.
NORRIS, Judge.
Rachel Smith, individually and on behalf of her two minor children, appeals a District Court judgment that dismissed her wrongful death and survival claims against the State of Louisiana, Department of Health and Hospitals, in this medical malpractice action. The State had conceded malpractice in that the staff of E.A. Conway Hospital in Monroe failed to diagnose the decedent's lung cancer. The District Court, however, found that this conduct neither deprived the decedent of a chance of survival nor diminished his life expectancy. We conclude that the District Court was plainly wrong in failing to find the loss of a chance of survival, and in failing to award wrongful death and survival damages proportionate to the loss of the chance. Accordingly we reverse and render.

Factual background
Benjamin Smith checked into E.A. Conway, a state operated general hospital in Monroe, in August 1987 for a sore on the top of his right foot. This was ultimately diagnosed as cellulitis with lymphangitis, and treated; minor surgery was performed to drain fluid. In the course of his five-day stay, the hospital took an x-ray of his chest. The radiologist, Dr. David Lawrence, noted in the x-ray a "mediastinal mass projected to the right of the trachea." All the experts said this should have alerted the treating physician to the possibility of lung cancer; however, no one advised Smith of it, and he was sent home to let his foot recuperate. The State Department of Health and Hospitals, which operates Conway, concedes that it was malpractice to fail to advise Smith of his condition and follow it up.
Over 14 months later, in late October 1988, Smith returned to Conway complaining that for the last three weeks he had suffered chest pains, weakness, fever and chills, and bloody cough. A new chest x-ray, taken October 31, showed that the mass had doubled in size. A bronchoscopy and biopsy taken on November 10 showed the worst: Smith suffered from small cell carcinoma of the lungs, a fast-acting and lethal cancer. Smith's cancer had already progressed to the "extensive" stage (present in both lungs), thus excluding surgery as a treatment option. Doctors placed him on aggressive chemotherapy, but it was too late. Smith spent the last two months of his life mostly confined to Conway, and finally died on March 16, 1989.
Smith's wife, Rachel, petitioned for a Medical Review Panel and ultimately filed this suit individually and on behalf on the couple's two children, Michael and Brian. As noted, the State conceded that its doctors breached the standard of care, but contested whether the breach caused any subsequent injury. At trial in November 1992, Mrs. Smith and her two sons testified about their family life together, and described Benjamin's last days. Dr. Ernest Moser, an economist at Northeast *657 Louisiana University in Monroe, testified as to probable financial losses resulting from Benjamin's death.
The parties submitted expert medical evidence by deposition. The plaintiffs' expert was Dr. Paul Bader, a consulting hematologist and oncologist from New York City, board certified in internal medicine and oncology. He defined "limited disease" lung cancer as that confined to one hemithorax or treatable by one radiation point, and "extensive disease" as everything else. He examined Smith's August 1987 x-ray and hospital records, and concluded it showed a limited disease. He testified that if Smith had then been treated with an "up-to-date combination of chemotherapy and radiation," he would have had a five-year survival chance of 13% to 25%. He conceded that older studies, such as a textbook by DeVita, placed the five-year survival rate at 7%, but he felt that modern rate was from 7-25%. (In an earlier deposition Dr. Bader had stated that patients with "very" limited disease, when treated with surgery, chemo and radiation, had a five-year survival rate of 40-80%, an estimate rejected by the other experts). He added that recurrences of cancer after five years were "rare." He also stated the 2½-year survival rate for a limited disease was 30-40%, although in the prior deposition he had said this was only 10-25%. By November 1988, when treatment was finally begun, Smith's cancer was extensive and his chances of survival were less than 1%. Dr Bader also testified that the average survival rate for an untreated case of limited small cell cancer was three months; in light of the fact that Smith actually survived 14 months after the cancer was first noted, Dr. Bader concluded that Smith's disease must have been "relatively indolent."
The defendants' expert was Dr. William Anderson, who is board certified in medical oncology, hematology and internal medicine. He examined all the applicable medical records. He defined a "limited" lung cancer as one confined to one side of the chest or thorax. From his examination of the August 1987 x-ray, he was not sure whether Smith had at that time a limited disease, which would have given him a life expectancy of 12-16 months, or an extensive disease, which would have given him 7-12 months. He considered it more likely, however, that Smith had a limited disease. Even with a limited disease subjected to aggressive treatment, Dr. Anderson testified that Smith's chance of surviving two years was only 7%, and his chance of surviving five to 10 years was 1-12%. (He conceded that he had seen clinical results of 23% five-year survival, but these included patients whose cancer was operable; Smith's was not.) He added that he had never seen a small cell lung cancer patient survive five to 10 years, but conceded that the failure to diagnose and treat Smith in August 1987 caused him to lose a chance of survival.
Dr. Roy G. Clay, director of surgical services at Conway, was Smith's treating physician. He related in great detail the course of treatment Smith underwent. He testified that "extensive stage" lung cancer means anything other than a solitary lesion on one lung, but felt the term meant different things to different people. He also testified that when he saw Smith in November 1988, he had extensive stage cancer, but admitted that at some prior time it might have been limited. Assuming that Smith had limited stage disease in August 1987, Dr. Clay estimated his chance of surviving two years was 15%, and his chance of surviving five years, 5%; he also placed Smith's life expectancy at that point at 24-26 months. (He did not disagree with Dr. Anderson's estimate of a 1-12% five-year survival chance.) Dr. Clay agreed with the other experts that by November 1988 Smith's chances of survival were virtually nil.
All three experts discussed various textbooks, articles and other sources of their estimates of the chances of survival for limited and extensive stage patients. The most controversial was the 1990 American College of Chest Physicians board certification syllabus, which referred to "one recent trial of concurrent chemotherapy and chest irradiation" as producing a 25% five-year survival rate in limited disease patients. None of the experts, however, was familiar with this trial or willing to confirm its results from personal experience.
*658 The final medical expert was Dr. David Lawrence, the radiologist who had noted the mediastinal mass in August 1987. Although he testified only as an expert in radiology, he stated that a patient with small cell cancer which has not spread has only a 10-15% chance of living five years.
The District Court summarized the evidence and concluded:
[T]he plaintiff failed to prove by a preponderance of the evidence that the failure to follow up the x-ray in 1987 with treatment caused the decedent to die or lose a chance of survival. In fact, the evidence overwhelmingly shows that decedent lived his expected life span had he been treated. Mr. Smith was very sick at the time of his x-ray in 1987 and the plaintiff has failed to prove he had a reasonable chance of survival. * * * Therefore the defendant is entitled to judgment dismissing the plaintiffs' claims. (emphasis added)

Applicable law
The plaintiff in a medical malpractice action has the burden of proving the degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians licensed to practice in Louisiana (or, in the case of specialists, the degree of care ordinarily practiced by physicians within that medical specialty); that the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill; and that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care, the plaintiff suffered injuries that would not otherwise have been incurred. La.R.S. 9:2794 A; Elliott v. Robinson, 612 So.2d 996 (La. App.2d Cir.1993), and citations therein.
Once a breach of duty constituting malpractice is established, the question of whether the malpractice contributed to the death, i.e., lessened the chance of survival, is a question for the fact finder. Hastings v. Baton Rouge Gen'l Hosp., 498 So.2d 713, 720 (La.1987). A substantial factor in lessening the chance of survival need not be the only causative factor; it need only increase the risk of harm. Id., citing Jones v. Montefiore Hosp., 494 Pa. 410, 431 A.2d 920 (1981), and Restatement (Second) of Torts, § 323 (1965).[1] See also Smith v. State through DHHR, 523 So.2d 815, 820-821 (La.1988); Tabor v. Doctors Memorial Hosp., 563 So.2d 233 (La. 1990); Martin v. East Jefferson Gen'l Hosp., 582 So.2d 1272, 1278 (La.1991); Ambrose v. New Orleans Police Dept. Ambulance Serv., 93-3099, p. 3 (La. 7/5/94), 639 So.2d 216, 219. The plaintiff need not show that the decedent would have survived had he received different treatment as the result of an earlier diagnosis; rather, the plaintiff need only show that the decedent had a chance of survival which was denied him as a result of the defendant's negligence. Smith v. State, 523 So.2d at 821. In Hastings v. Baton Rouge Gen'l, supra, the Supreme Court cited with approval a New York case in which the destruction of a 2% chance of survival was found to pose a jury question. See Kallenberg v. Beth Israel Hosp., 357 N.Y.S.2d 508, 45 A.D.2d 177 (1974), aff'd, 37 N.Y.2d 719, 374 N.Y.S.2d 615, 337 N.E.2d 128 (1975).
Louisiana courts have not decided the measure of damages in cases of loss of a chance of survival. See Ambrose v. New Orleans Police Dept., supra. A leading commentator has stated that damages should not be denied to a very sick patient whose chances of survival were remote and who was the victim of malpractice; rather, the damages should be proportionate to the loss of the chance. King, "Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences," 90 Yale L.J. 1353, 1382 (1981). The Oklahoma Supreme Court, in adopting Professor King's approach, has referred to it *659 as the majority rule. McKellips v. Saint Francis Hosp., 741 P.2d 467, 474 (Okla.1987). This assessment appears accurate. See Falcon v. Memorial Hosp., 436 Mich. 443, 461-468, 462 N.W.2d 44, 52-56 (1990); Annotation, "Medical Malpractice: `Loss of Chance' Causality," 54 A.L.R.4th 10, § 5.
A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. Esco, 549 So.2d 840 (La. 1989). Thus, to reverse a trial court the appellate court must find from the record that a reasonable factual basis does not exist for the finding, and further that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). The manifest error rule applies equally to findings based on testimonial and documentary evidence. Virgil v. American Guar. & Liab. Ins. Co., 507 So.2d 825 (La.1987).

Discussion: Manifest error
By her first assignment Mrs. Smith urges the District Court erred in failing to find the loss of a chance of survival; by her second, she urges the court erroneously imposed on her the burden of proving the loss of a reasonable chance of survival rather than loss of a chance of survival.
Mrs. Smith's first point is so obvious that it does not require long discussion. Contrary to the District Court's holding, every expert testified that Smith lost a chance of survival. Dr. Bader rated Smith's 2½-year chance of survival at 30-40%, and his five-year chance of survival at 7-25%. Dr. Anderson assessed Smith's two-year chance of survival at 7%, and his five-to-10 year chance at 1-12%. Dr. Clay, the treating physician, did not dispute Dr. Anderson's estimates; he also stated that Smith's two-year survival chance was 15%, and five years, 5%. Dr. Lawrence, though not an expert in cancer treatment, estimated that in August 1987 Smith had a 10-15% chance of surviving five years. In light of this evidence, the District Court was plainly wrong to find that Smith did not lose a chance of survival. Rosell v. Esco, supra.
The second assignment is more complex. In Smith v. State, 523 So.2d at 822, the Supreme Court stated, "The medical malpractice plaintiff does not have the unreasonable burden of proving that the patient would have lived if the defendant had not been negligent." Later, in Martin v. East Jefferson Gen'l Hosp., the court elaborated:
[I]n a situation where the patient dies, the plaintiff need only prove that the defendant's malpractice resulted in the patient's loss of a chance of survival, and * * * the plaintiff need not shoulder the "unreasonable burden" of proving that the patient would have survived if properly treated. 582 So.2d at 1278.
Most recently, the court in Ambrose v. New Orleans Police Dept. phrased the burden as one of proving that the defendant's acts or omissions "caused [the patient's] death or were the cause in fact of [his] loss of a chance of survival[.]" 639 So.2d at 219.
Admittedly, the District Court was not wrong to observe that Smith lived, untreated, as long as the average patient who underwent treatment; we understand that the tangle of statistics advanced by the experts could be confusing. However, the law of Smith, Martin and Ambrose is quite clear that the patient's actual survival, in the face of medical malpractice, is not the critical issue. Rather, the plaintiff's burden is to prove the destruction or diminution of a chance. On the record presented, Smith had the chance, if properly treated, of living five or more years. Because of the missed diagnosis, he lived 14 months without treatment, and five months with chemo; in short, the malpractice deprived him of the chance to live longer.
In support of the judgment, the State cites the recent federal case of Ruff v. Bossier Medical Center, 952 F.2d 138 (5th Cir.1992). In that case the Court of Appeals affirmed a lower court judgment which dismissed a malpractice claim on the basis that the plaintiffs did not prove a reasonable chance of survival. Although none of the Louisiana cases required proof of a reasonable chance, the Fifth Circuit noted other language in Hastings and in Tabor v. Doctors Memorial Hosp., 563 So.2d 233 (La.1990), which did *660 require that the malpractice be a "substantial" factor in reducing the chance of survival. The court apparently felt that the "substantial factor" language justified altering "a chance of survival" to a "reasonable chance of survival." Ruff, 952 F.2d at 141.
We disagree. In Hastings the Supreme Court explained the "substantial factor" language as a source that need not be the only factor in reducing the patient's chance of survival. 498 So.2d at 720. While it is unlikely that any factors would be at issue other than the nature of the patient's sickness and the defendant's malpractice, the discussion in Hastings convinces us that malpractice may be a substantial factor in destroying even a very modest chance of survival. The court cited Kallenberg v. Beth Israel Hosp., supra, in which the loss of a 2% chance of survival was found to pose a jury question. Smith, Martin and Ambrose allow recovery for the loss of any chance of survival, provided the malpractice is shown to be a substantial factor in causing that loss. The District Court improperly elevated the burden by requiring the plaintiff to prove a reasonable chance of survival. We decline to follow the Federal Court's analysis in Ruff.[2]
We are cognizant of the recent case of Scheidt v. Denney, 93 2014 (La.App. 1st Cir. 10/7/94), 644 So.2d 813, which approved a jury charge stating that the defendant's conduct must be a substantial factor in causing the decedent's suicide. The court of appeal relied on language from Tabor v. Doctors Memorial Hosp., supra, also a suicide case, stating that the defendant's conduct was a substantial factor (80%) in the cause of the decedent's death. 563 So.2d at 238. We do not, however, read Tabor to eliminate loss of a chance of survival as a cause of action; the main thrust of the opinion is to reaffirm it. At any rate, the opinion in Scheidt does not suggest that the case was presented as one of loss of a chance, or that any evidence to that effect was introduced; in those circumstances, the court of appeal was certainly correct to affirm the denial of the plaintiffs' jury charge. Scheidt is therefore distinguished.
In this case every expert testified that the failure to diagnose and treat Smith's condition in August 1987 caused him to lose a chance of survival, although they disputed the extent of the chance. On this record, it is plainly wrong to find the State's conduct was not a substantial factor in causing Smith's harm. For these reasons, the judgment dismissing Mrs. Smith's claims will be reversed.

Measure of damages
By her second assignment Mrs. Smith also argues that once she proved the loss of a chance, she was entitled to full damages for the loss. The State argues that under the loss of a chance of survival doctrine, the plaintiff is entitled not to full recovery, but to damages proportionate to the size of the chance. The issue appears to be one of first impression, as in Ambrose v. New Orleans Police Dept., supra, the Supreme Court stated that it has "not yet addressed the proper measure of damages to be awarded where the plaintiff has proven only the loss of a chance of survival."
Our analysis begins with the observation that the Supreme Court has firmly established the doctrine of loss of a chance as the law of Louisiana in the cases of Hastings v. Baton Rouge Gen'l Hosp., Smith v. State, Martin v. East Jefferson Gen'l Hosp., and Ambrose v. New Orleans Police Dept., supra. This right obviously deviates from the usual rule that the plaintiff in a wrongful death case may not recover unless he proves, more probably than not, that the defendant's conduct caused the death. The nature of the right is explained by Professor King in his law review article:
[C]onsider the case in which a doctor negligently fails to diagnose a patient's cancerous condition until it has become inoperable. Assume further that even with a timely diagnosis the patient would have had only a 30% chance of recovering from the disease and surviving over the *661 long term. There are two ways of handling such a case. Under the traditional approach, this loss of a not-better-than-even chance of recovering from cancer would not be compensable because it did not appear more likely than not that the patient would have survived with proper care. Recoverable damages, if any, would depend on the extent to which it appeared that cancer killed the patient sooner than it would have with timely diagnosis and treatment, and on the extent to which the delay in diagnosis aggravated the patient's condition, such as by causing additional pain. A more rational approach, however, would allow recovery for the loss of the chance of cure even though the chance was not better than even. The probability of long-term survival would be reflected in the amount of damages awarded for the loss of the chance. While the plaintiff here could not prove by a preponderance of the evidence that he was denied a cure by the defendant's negligence, he could show by a preponderance that he was deprived of a 30% chance of a cure. 90 Yale L.J. 1362-1363 (emphasis added).
In other words, the plaintiff retains the burden of proving causation by a preponderance of evidence, but may recover for a less-than-50% chance of survival. The rationale for relaxing the standard is discussed in Herskovits v. Group Health Cooperative, 99 Wash.2d 609, 664 P.2d 474 (1983), a case cited as authority by the Supreme Court in Hastings v. Baton Rouge Gen'l, supra. In the typical tort case, the "but for" test, requiring proof that damages or death probably would not have occurred but for the defendant's negligent conduct, is appropriate. In a medical malpractice case, however, the defendant's act or omission fails in a duty to protect against harm from another source. Thus the fact finder must consider not only what did occur, but also what might have occurred. "Such cases by their very nature elude the degree of certainty one would prefer and upon which the law normally insists before a person may be held liable." Id., 99 Wash.2d at 616, 664 P.2d at 477, quoting Hamil v. Bashline, 481 Pa. 256, 271, 392 A.2d 1280 (1978). In Falcon v. Memorial Hosp., supra, the Michigan Supreme Court offered additional reasons for lowering the standard:
The scope of the undertakings by a physician or hospital to the patient and by the patient to the physician or hospital is not generally a matter of express agreement. There is, however, an understanding that the law enforces in the absence of express agreement. The patient expects a physician to do that which is expected of physicians of like training in the community, and the physician expects the patient to pay or provide payment for the services, whether the likelihood of there in fact being any benefit to the patient is only one through fifty percent or is greater than fifty percent. 436 Mich. at 458, 462 N.W.2d at 51.
Although the Louisiana courts have not addressed the question, Professor King and the leading cases to adopt the loss of a chance doctrine have reasoned that to balance the relaxing of the more-likely-than-not rule, a concomitant reduction of the potential damages is appropriate. Professor King proposes to measure a compensable chance as "the percentage probability by which the defendant's tortious conduct diminished the likelihood of achieving some more favorable outcome." He explains:
[C]onsider a patient who suffers a heart attack and dies as a result. Assume that the defendant-physician negligently misdiagnosed the patient's condition, but that the patient would have had only a 40% chance of survival even with a timely diagnosis and proper care. Regardless of whether it could be said that the defendant caused the decedent's death, he caused the loss of a chance, and that chance-interest should be completely redressed in its own right. * * * [T]he plaintiff's compensation for the loss of the victim's chance of surviving the heart attack would be 40% of the compensable value of the victim's life had he survived (including what his earning capacity would otherwise have been in the years following death). The value placed on the patient's life would reflect such factors as his age, health, and earning potential, including the fact that he had suffered the heart attack and the assumption *662 that he had survived it. The 40% computation would be applied to that base figure. 90 Yale L.J. at 1382 (footnote omitted).
This rationale appears to balance the interests of patient and physician, plaintiff and defendant. In fact, the cases cited by the Supreme Court in Hastings to support the adoption of the loss of a chance rule, Herskovits v. Group Health Cooperative, supra, and Hamil v. Bashline, supra, both adopt the percentage probability of loss theory described by Professor King. The Oklahoma Supreme Court has referred to this as the "majority" rule, McKellips v. Saint Francis Hosp., 741 P.2d at 474, and our review shows that the better-reasoned opinions follow it.[3] Given the persuasiveness of Professor King's explanation, and the fact that the Supreme Court in Hastings relied on other-state cases that adopted his reasoning, we conclude that the percentage probability of loss, if less than 50%, is the proper measure of the plaintiff's damages in a case of wrongful death due to medical malpractice.
This conclusion is fortified by Louisiana jurisprudence that makes a defendant liable for aggravating the plaintiff's pre-existing condition. In such a case, the defendant must compensate the plaintiff for the full extent of the aggravation, not for his entire post accident condition. Perniciaro v. Brinch, 384 So.2d 392 (La.1980); Chambers v. Graybiel, 25,840 (La.App. 2d Cir. 6/22/94), 639 So.2d 361. The extent of the aggravation to a person with a pre-existing injury is conceptually similar to the extent of diminishing a sick person's odds of survival because of malpractice. It would not be logical or fair to impose full liability on a physician whose act or omission injures a patient whose chances of recovery were slim at best; and yet, imposing liability proportionate to the patient's chances is proper to assure the physician exercises reasonable care.
In brief and at oral argument, counsel for Mrs. Smith has submitted a number of Louisiana cases in which, she claims, full damages were awarded for loss of a chance. These include Hunter v. Office of Health Services, 385 So.2d 928 (La.App. 2d Cir.), writ denied 393 So.2d 737 (1980), Savelle v. Heilbrunn, 552 So.2d 52 (La.App. 3d Cir.1989), writ denied 556 So.2d 1267 (1990), Knopfer v. Louisiana Patients Comp. Fund, 527 So.2d 326 (La.App. 4th Cir.1988), Doe v. McNulty, 630 So.2d 825 (La.App. 4th Cir.1993), writ denied 631 So.2d 1167 (1994), and Turner v. Massiah, 94-26, (La.App. 4th Cir. 7/1/94), 641 So.2d 610. It is significant to note that all these cases antedate the Supreme Court's statement in Ambrose v. New Orleans Police Dept., 639 So.2d at 219, that "the proper measure of damages to be awarded where a plaintiff has proven only the loss of a chance of survival" has not yet been decided. None of these cases involved a wrongful death claim. Further, although the patient's numerical odds were mentioned in Knopfer, neither in that case nor any of the others were the patient's chances of recovery considered in the context of the measure of damages. These cases do not dissuade us from our conclusion.
Here, the experts offered many estimates of Mr. Smith's chances of survival for various periods of time. Dr. Anderson placed his five year survival rate at 1-12%; Dr. Lawrence placed it at 10-15%. Dr. Clay, the treating physician, placed Smith's five-year survival rate at 5%, but did not disagree with Dr. Anderson's estimate. Dr. Bader placed the five-year survival rate at 7-25%, but acknowledged that older sources gave the more conservative estimate of 7%, and that his upper figure was a mere extrapolation. A range of from 7-12% seems to encompass all witnesses' estimates. After November 1988, Mr. Smith's chance of survival was 1% or less. On the record presented, the evidence preponderates to show that the State's conduct was a substantial factor in depriving Mr. Smith of a 10% chance of *663 surviving five years. The damage award will be calculated accordingly.

Quantum
By her third assignment Mrs. Smith urges the trial court erred in failing to award damages. She correctly contends that when the appellate court finds reversible error of law or manifest error of material fact, that court is required to determine the facts de novo from the entire record and render, if possible, a judgment on the merits. La. C.C.P. art. 2164; Rosell v. Esco, supra; Beckham v. St. Paul Fire & Marine Ins. Co., 614 So.2d 760 (La.App. 2d Cir.1993). In making an initial award of damages, the appellate court is not limited to an award of either the highest or lowest amount that it could affirm, but may set the award for just compensation under the circumstances. Beckham v. St. Paul, supra.
The State urges in brief that Mrs. Smith has contested the constitutionality of the medical malpractice cap of R.S. 40:1299.39, that the parties jointly moved to bifurcate this issue from the instant trial, and that an award of damages would not be appropriate until the constitutional matter is resolved. In other words, the State contends that if damages are to be awarded, they should be deferred until the District Court rules on R.S. 40:1299.39. In light of our resolution of the case, however, the malpractice cap of $500,000 is not an issue. The State further argues that in any event the District Court is the best suited to determine the plaintiffs' damages. However, this court has the duty to make findings of fact and to fix damages when the record so permits. La.C.C.P. art. 2164; Rosell v. Esco, supra. The instant record is sufficient to determine reasonable damages.
In brief Mrs. Smith cites trial testimony that she and Mr. Smith had a very loving and caring relationship as husband and wife; he taught her how to cook, spent every evening at home with her and the boys, hunted and fished with her, and played volleyball and dominoes together. All of this, she argues, supports wrongful death awards of $250,000 for herself and $225,000 for each of Mr. Smith's sons.
In the recent case of Reid v. State through DOTD, 25-778 (La.App. 2d Cir. 5/4/94), 637 So.2d 618, writ denied 94-1415 (La. 9/16/94), 642 So.2d 198, this court reviewed the synopsis of wrongful death awards contained in our earlier case of Thomas v. State Farm Ins. Co., 499 So.2d 562 (La.App. 2d Cir.1986), writ denied 501 So.2d 213, 215 (1987). We found that the "mass of general damage awards" for loss of a spouse ranged from $7,500 to $200,000, with $100,000 being the most frequent award closely followed by $150,000. Id., 499 So.2d at 566. In Reid the trial court found the decedent and his wife were a "model of family closeness" and enjoyed "an extraordinarily close and loving relationship," and awarded her $300,000 for wrongful death. The court's findings were supported by corroborating witnesses and expert psychiatric reports elements not present in the instant case which justified affirming the award. In Litton v. Ford Motor Co., 554 So.2d 99 (La.App. 2d Cir.1989), writ denied 559 So.2d 1353 (1990), we affirmed an award of $250,000 for wrongful death of the plaintiff's wife; we noted, however, that this sum included loss of income and household services. In the instant case, Mr. Smith's lost earnings are adequately documented and separately awarded, and do not justify elevating the general damage award.
On the record presented, we find awards of $150,000 each to Mrs. Smith and her two sons, Brian and Michael, are warranted for the wrongful death of Benjamin Smith. These sums are subject to reduction to 10%, representing the loss of a chance for which the State is liable.
Mrs. Smith's uncontradicted testimony was that the funeral expenses were $4,004.00. This amount will be awarded, also subject to the reduction to 10%.
Mrs. Smith's expert economist, Dr. Moser, testified without contradiction that between the date of his death and the date of trial, Mr. Smith's income would have been between $32,042.80 and $91,603.20. While the foundation for this evidence may have been weak (no income tax returns, and *664 only three weekly pay stubs from isolated weeks when his pay was likely to have been higher), there was no evidence to refute its accuracy, and the average of $61,823.00 will be awarded, subject to the reduction. Dr. Moser also projected Mr. Smith's future lost earnings at $192,276.81, and the value of his household services at $46,200.62. Dr. Moser subtracted $50,000 for Mr. Smith's own personal consumption. This yields a total of $250,300.43 for economic losses, which will be awarded, subject to reduction to 10% for the loss of the chance of survival. As Dr. Moser did not indicate which portion of these damages would be allocated to Mrs. Smith and to the children, it will be awarded one-third to each.
Finally, Mrs. Smith claims the survival action for her husband's pain and suffering prior to his death. La.C.C. art. 2315.1. Although the doctors at E.A. Conway failed to diagnose cancer in 1987, Mr. Smith did not begin experiencing symptoms until October 1988. Thereafter he was subjected to multiple-drug therapy with Dr. Clay. The result was weakness and pain, for which Darvocet-N 100, a pain medication, was eventually prescribed. By January 1989 Mr. Smith suffered nearly constant pain and weakness, chiefly because the cancer had metastasized into, and enlarged, his liver. Mr. Smith spent his last two months in the hospital; a final round of chemotherapy was administered only a week before his death. The photographs in evidence show that he was emaciated and in obvious discomfort in his final days. Dr. Clay also testified, however, that chemotherapy itself usually brings about pain and nausea for its patients. From this we infer that even timely diagnosis and treatment with Dr. Bader's "up-to-date combination of chemotherapy and radiation" would not have alleviated the debilitating side effects of treatment.
In Winder v. Avet, 613 So.2d 199 (La.App. 1st Cir.1992), writs denied 617 So.2d 907 (1993), the decedent was misdiagnosed with pancreatic cancer, when he actually had chronic pancreatitis. As a result he was subjected to improper radiation treatment which resulted in liver failure. The court of appeal affirmed an award of $500,000 for his four years of excruciating pain and suffering prior to death. In Kennedy v. United States, 750 F.Supp. 206 (W.D.La.1990), the plaintiff's doctor failed to diagnose breast cancer; as a result, her chance of survival was reduced from 90% to nil. The Federal District Court found that she had two years left to live, in which time the cancer was certain to spread to her bones, causing great pain. The court awarded $400,000 for her pain and suffering. In Cornett v. State through W.O. Moss Hosp., 614 So.2d 189 (La.App. 4th Cir.), writs denied 617 So.2d 906, 907 (1993), the decedent suffered from a pituitary gland disorder and sleep apnea. Although his doctors, general practitioners and emergency room physicians at Moss, set appointments for Mr. Cornett at Moss's endocrinology clinic, the hospital either lost or failed to honor them. As a result, Mr. Cornett's condition went untreated for 10 months before his death; the court characterized his condition for this period as "excruciatingly painful." The court affirmed an award of $100,000 for the survival action.
Mr. Smith underwent five months of pain, weakness and emotional distress before his death. In light of the fact that much of this, arising from chemotherapy, was inevitable even with timely diagnosis, and the cases cited above, we find an award of $60,000 is appropriate for Mr. Smith's pain and suffering, and consequently for the survival action. As the record does not show how much of his pain and suffering was particularly related to Mr. Smith's knowledge that he lost a 10% chance of recovery, but seems to be the general consequence of his illness, this award is also subject to reduction to 10%.

Conclusion
For the reasons expressed, the judgment dismissing Mrs. Smith's suit is reversed and judgment is rendered herein as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the plaintiff, Rachel Smith, individually, and against the defendant, The State of Louisiana, Department of Health and Hospitals, in the full sum of Twenty-five Thousand, Seven hundred forty-three *665 and .75/1.00 ($25,743.75) dollars, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Rachel Smith as tutrix of the minor Michael Smith, in the full sum of Twenty-five Thousand, Three hundred forty-three and .35/1.00 ($25,343.35) dollars, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Rachel Smith as tutrix of the minor Brian Smith, in the full sum of Twenty-five Thousand, Three hundred forty-three and .35/1.00 ($25,343.35) dollars, together with legal interest thereon from date of judicial demand until paid.
Trial court costs of $819.14, together with appellate costs of $113.50, are assessed to the State in accord with La.R.S. 13:5112.
REVERSED AND RENDERED.
SEXTON, J., concurs with reasons.
SEXTON, Judge, concurring.
I subscribe to this opinion except to the extent it relies on Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1987), which was a two-judge plurality opinion.
NOTES
[1] "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

"(a) his failure to exercise such care increases the risk of such harm, or
"(b) the harm is suffered because of the other's reliance upon the undertaking."
[2] The Federal Court's interpretation of state law is, at any rate, not binding on this court. See Exchange Nat'l Bank of Chicago v. Spalitta, 321 So.2d 338 (La.1975), cert. denied 425 U.S. 904, 96 S.Ct. 1494, 47 L.Ed.2d 753, and Graham Resources Inc. v. Lexington Ins. Co., 625 So.2d 716 (La.App. 1st Cir.1993), writ denied 93-2809 (La. 1/13/94), 631 So.2d 1164.
[3] See, e.g., Mays v. United States, 608 F.Supp. 1476 (D.Colo.1985), rev'd on other grounds 806 F.2d 976 (10th Cir.1986), cert. denied 482 U.S. 913, 107 S.Ct. 3184, 96 L.Ed.2d 673 (1987); DeBurkarte v. Louvar, 393 N.W.2d 131, 73 A.L.R.4th 1 (Iowa 1986); Perez v. Las Vegas Medical Center, 107 Nev. 1, 805 P.2d 589 (1991); Olah v. Slobodian, 119 N.J. 119, 574 A.2d 411 (1990).