698 So.2d 469 (1997)
Rosalie BOUDOIN, et al.
v.
NICHOLSON, BAEHR, CALHOUN & LANASA, et al.
No. 96-CA-0363.
Court of Appeal of Louisiana, Fourth Circuit.
July 30, 1997.
*470 Christopher E. Lawler, Kenneth W. Andrieu, Donovan & Lawler, Metairie, for plaintiffs/appellees Rosalie Boudoin, et al.
C. William Bradley, Jr., Richard E. Gruner, Jr., Lemle & Kelleher, L.L.P., New Orleans, for defendant/appellant Albert I. Hendler, M.D.
Before SCHOTT, C.J., and KLEES and MURRAY, JJ.
MURRAY, Judge.
Dr. Albert I. Hendler and the Louisiana Patients' Compensation Fund[1] appeal an award of $560,000 to the widow and adult children of Elton A. Boudoin, Sr., based upon a jury's finding that the doctor's improper reading of Mr. Boudoin's x-ray resulted in a loss of chance to survive a chest-wall cancer. We affirm the finding of liability and causation, but amend the judgment to reduce the damages awarded.

FACTS
On May 17, 1988, 43-year-old Elton Boudoin suffered a minor shoulder injury while lifting something at his job as a pipefitter. Because the pain did not subside after a few days, on May 19th he went to see Dr. Farrell R. Nicholson, the family practitioner who had treated him since he was eighteen. Based upon Mr. Boudoin's complaint of pain in the outer chest and a physical examination, Dr. Nicholson took a chest x-ray that, in his opinion, showed nothing remarkable. A cardiogram was also normal, so Dr. Nicholson diagnosed Mr. Boudoin's injury as a muscle strain and prescribed accordingly. Nevertheless, he sent the x-ray to be evaluated by a diagnostic radiologist, Dr. Hendler. The radiology report returned to Dr. Nicholson read as follows:
CHEST: Cardiac, hilar and mediastinal shadows do not appear unusual. Both lung fields and angles appear clear. A 3.5 cm. broad based benign osteomatous projection is noted at the level of the vertebral border of the inferior aspect of the left scapula.
IMPRESSION: 1No evidence of active pulmonary or cardiac pathology 2A 3.5 cm. broad based osteoma left scapula
Since the osteoma, meaning a lesion in bone tissue, was identified as benign, Dr. Nicholson took no further action based upon this x-ray. Mr. Boudoin continued to report symptoms consistent with a muscle strain, so on May 26, 1988 Dr. Nicholson referred him to an orthopedist for further treatment of the apparent injury.
Mr. Boudoin did not contact Dr. Nicholson again until January 1989, when he complained of discomfort in his neck as well as pain in his right shoulder blade and arm. Dr. Nicholson again ruled out serious injury through a cervical x-ray, resulting in a diagnosis *471 of cervical spasm, degenerative discs and bilateral spondylosis.
On April 18, 1989, Mr. Boudoin returned to Dr. Nicholson complaining of night sweats, weight loss and pain in his left chest. A chest x-ray showed a large abnormal mass, so Mr. Boudoin was given both the 1988 x-ray and the one just taken, and was immediately sent to see a pulmonologist, Dr. Eugene Rosenberg. On his way to Dr. Rosenberg's office, Mr. Boudoin went to J.C. Penney's, where his wife, Rosalie, worked. On the verge of tears, he told his wife that the doctor had "found something" on his lungs and that he had to see a lung specialist. Mrs. Boudoin clocked out and accompanied her husband to the pulmonologist's office, where he delivered the two x-rays and underwent various examinations and tests.
While Mr. Boudoin was undergoing a breathing test, Dr. Rosenberg called Mrs. Boudoin into his office and showed her the tumor as it appeared on the x-rays taken eleven months apart, and also had her read Dr. Hendler's May 1988 report. Although Dr. Rosenberg told Mrs. Boudoin that the tumor could have been removed easily when it was as small as it first appeared, she did not attach any importance to the discussion. As she testified at trial, from the moment her husband had told her about Dr. Nicholson's discovery, her attention was focused on his life and survival, rather than the past.
Although the tumor initially appeared to be on Mr. Boudoin's left lung, innumerable tests and examinations in the next few weeks established that the cancer was in the pleura, the tissue lining the chest wall; it was definitely malignant. While a bone scan of the ribs indicated those on the left had a different absorption rate than on the right, no sign of metastasis was found in the lymph nodes of the chest or other tissues. The tumor, now measuring 20 by 17.5 by 7 centimeters, was surgically removed by Dr. C. Swayze Rigby on May 10, 1989, along with a large portion of the chest wall and four ribs. Because a four or five millimeter metastatic deposit was found in Mr. Boudoin's right diaphragm, a section of that tissue also was removed, but there was no sign of cancer on the lungs. A metal plate was implanted to replace the structural support lost with the removal of the ribs.
After recovering from his surgery, Mr. Boudoin underwent concurrent radiation and chemotherapies during the months of June through August, 1989, with a final course of chemotherapy in September. X-rays and examinations done every other month through March 1990 showed no signs of recurrence. Four months later, however, abnormalities were detected, and a second surgery was performed on July 20, 1990. The surgeon now found a tumor that was so extensive that "we were never able to get entirely beyond it, and it did not allow access to the intrapleural cavity." The only tissue removed during the surgery was a biopsy sample, which confirmed a malignant recurrence. Mr. Boudoin and his family were informed that even with chemotherapy, the prognosis was very poor. Further treatment was restricted to alleviating pain until Mr. Boudoin's death on December 18, 1990.

PROCEDURAL HISTORY
In September 1991, a medical malpractice complaint was filed pursuant to statute, asserting that both Dr. Nicholson and Dr. Hendler had breached the applicable standards of care by failing to detect Mr. Boudoin's cancer in May 1988, resulting in his death. These claims were presented to a single medical review panel consisting of one family practitioner and two radiologists. The panel unanimously concluded that Dr. Nicholson's reliance on Dr. Hendler's report was in accord with accepted medical standards, but that Dr. Hendler had breached the standard of radiological care by summarily diagnosing the lesion as benign. However, it was found that this breach had not resulted in any damages, because "[t]he patient's outcome under the most ideal circumstances would likely have been the same" since life expectancy with a tumor of this type was only two years.
This timely suit for damages against Dr. Hendler, Dr. Nicholson and Dr. Nicholson's medical group followed. In addition to his denials of liability and causation, Dr. Hendler's answer included the defenses that the survival action was perempted and the *472 wrongful death claim had prescribed. However, the record does not reflect any attempt to obtain a pre-trial ruling on these issues. Instead, after normal discovery and the eventual dismissal of all claims against Dr. Nicholson and his associates, the matter was tried to a jury July 26 through 28, 1995.
As the first witness called, Dr. Hendler conceded in his testimony that "I made the wrong histological diagnosis, which I shouldn't have even attempted to make. I should have just said, `There's a lesion there and it needs to be worked up.'" Thereafter, the testimony and evidence addressed primarily the question of whether a May 1988 cancer diagnosis could have altered the outcome for Mr. Boudoin, as well as the amount of damages suffered. The resultant verdict indicated that Dr. Hendler had breached the applicable standard of care and that this conduct was "a proximate cause in lessening Mr. Boudoin's chance of survival." Damages were awarded for Mr. Boudoin's pain and suffering, $175,000; lost wages and earning capacity, $204,000; medical and funeral bills, $60,000; Mrs. Boudoin's pain and suffering, $200,000; and $125,000 to each of Mr. Boudoin's two adult children, Charlene Cavalier and Elton Boudoin, Jr., for their pain and suffering. The trial court entered judgment on this verdict, subject to reduction and allocation as required by the medical malpractice statutes, along with costs and legal interest from September 30, 1991 until paid.[2]
Dr. Hendler moved for a new trial or judgment notwithstanding the verdict, contending that both the finding of causation and the amount of damages awarded were contrary to the law and evidence. He first argued that the survival action had prescribed because it was not filed within one year from April 18, 1989, the date on which Mrs. Boudoin was told her husband's cancer was visible on the earlier x-ray. Dr. Hendler next asserted that since five of the eight doctors who had testified opined that, even with an earlier diagnosis, Mr. Boudoin had no "practical" chance of surviving the type of cancer he had, the jury's verdict should be vacated. Alternatively, the defendant contended that judgment should be entered for only 5% of the damages awarded, in accord with the calculation pronounced in Smith v. State Dept. of Health & Hospitals, 26,280 (La.App.2d Cir. 12/9/94), 647 So.2d 653, writ granted, 95-0038 (La.3/10/95), 650 So.2d 1167, because 5% was the maximum chance of survival assigned by any of the experts. After hearing arguments, the trial court denied both motions.
On appeal, Dr. Hendler again argues that this suit must be dismissed as prescribed because no claim was filed within one year of the date the Boudoins had constructive notice of the doctor's negligence. He also contends that the jury was manifestly erroneous in finding that Mr. Boudoin might have survived if his cancer had been diagnosed in May 1988 because the testimony does not reasonably support that conclusion. However, if any damages are due, Dr. Hendler asserts that this court must perform a de novo review and reduce the award to conform to the Supreme Court's analysis in Smith v. State Dept. of Health & Hospitals, 95-0038 (La.6/25/96), 676 So.2d 543, which was handed down while this appeal was pending.
The Boudoin family contends that because the issue of prescription was not properly raised until after entry of the trial court's judgment, it should not be considered on appeal. Even so, they argue that the facts and circumstances are insufficient to infer that Mrs. Boudoin's discussion with Dr. Rosenberg on April 18, 1989 put them on notice that malpractice had occurred or that any harm had thereby resulted; their claims were timely filed within one year of Mr. Boudoin's death. Finally, the Boudoins assert that under the Supreme Court's Smith decision, both the determination of liability as well as the amount of damages are fully supported by the evidence and testimony presented at trial.[3]

*473 PRESCRIPTION
An exception of prescription must be specially pleaded, but it may be filed at anytime prior to submission of the case in the trial court. La.Code Civ. Proc. Ann. arts. 927, 928. This exception may also be filed and decided in the appellate court if the proof of the grounds for the exception appears in the record. La.Code Civ. Proc. Ann. art. 2163. If the ground for the exception is prescription, the plaintiff has the option to demand that the case be remanded for trial of the exception. Id.
The maximum limitations period for filing a medical malpractice claim is three years from the date of the wrongful act or omission. La. R.S. 9:5628. This legislative enactment abrogates the discovery rule, the fourth category of the judicially created doctrine of contra non valentem, in medical malpractice cases. Chaney v. State Dept. of Health & Human Resources, 432 So.2d 256 (La.1983). However, as explained in Taylor v. Giddens, 618 So.2d 834 (La.1993), the three-year limitations period applies to a medical malpractice survival action to recover for the deceased victim's losses, but it does not affect a wrongful death claim by the victim's family.
In this case, Dr. Hendler's exception of prescription was properly pleaded in his answer, and the grounds for the exception to the Boudoins' survival action is apparent on the pleadings: Dr. Hendler's failure to properly analyze the x-ray occurred on May 19, 1988, but the medical malpractice claim was not submitted for panel review until September 1991, more than three years later. Although Mrs. Boudoin said that no one told her until July 1991 that Dr. Hendler had been negligent, she also testified that he had not contacted her or prevented her from discovering the facts at any time.
Because the exception of prescription was thus timely filed and does not require a factual determination concerning discovery of the cause of action, we find no procedural bar to our determination of the issue on appeal. Under the express holding of Taylor v. Giddens, supra, the Boudoin family's claims to recover for injuries suffered by Mr. Boudoin are perempted by R.S. 9:5628; only compensation for their own losses arising from his death may be recovered. Accordingly, the damage award must be reduced if the finding of liability is affirmed.

CAUSATION
Both parties to this appeal agree that, pursuant to Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986) and its progeny, the plaintiffs need not prove that Mr. Boudoin would have survived but for Dr. Hendler's conduct. However, they must establish by a preponderance of the evidence that he had a chance for survival and that this chance was lost due to the defendant's negligence. Smith v. State Dept. of Health & Human Resources, 523 So.2d 815, 822 (La.1988). This determination of causation is a factual finding that is subject to the manifest error/clearly wrong standard of review. Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1276 (La.1991). This court cannot reverse the jury's finding in favor of the Boudoins unless the record as a whole provides no reasonable factual basis for that finding and the record establishes that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). We thus must examine the expert testimony presented in this case to determine if there is any reasonable support for the jury's finding that Mr. Boudoin had a chance of survival in May 1988 but that he no longer had that same chance in April 1989.
Both family practitioners who testified, Dr. Nicholson, a treating physician, and Dr. John J. Finn, a member of the medical review panel, indicated that they would defer to cancer specialists to estimate survival rates. Dr. Nicholson admitted, though, that of the ten or twelve patients he had seen with similar tumors, not many survived more than one year after a "prompt" diagnosis, and all had died of their cancers eventually. In his opinion, in May 1988 Mr. Boudoin's chance of *474 survival was "slim, if any." Similarly, Dr. James W. Keating, Jr., a diagnostic radiologist who had served on the review panel, estimated that the prognosis was "poor" in 1988, based partially on what the other two panelists had said. He also would defer to the oncologists, pulmonologists and chest surgeons as better able to assess Mr. Boudoin's relative chances of survival.
Dr. Gerald E. Liuzza, a pathologist, testified that, even with the best and earliest treatment, most patients with chest-wall tumors die within one or two years, "unless you're one of the very unusual lucky ones." While it may be less taxing for the patient if a marble-sized tumor, rather than one the size of a golf ball, is removed, the recurrence rate of these rare cancers of the chest wall indicates that even the best surgical resection "might not have any effect" on long-survival. He would defer to the surgical and medical oncologists for more detailed frequency rates and treatment options.
Mr. Boudoin's treating thoracic surgeon, Dr. Rigby, was of the opinion that a May 1988 diagnosis would definitely have improved the patient's chances for surviving five years. Both West Jefferson Hospital's and Tulane Medical Center's pathologists' reports showed that the tumor was a chest-wall sarcoma, for which there is generally a twenty-five-to fifty-percent five-year survival rate. Although Dr. Rigby agreed that the 1988 x-ray demonstrated the cancer "was already well in play" at that time, the minimal size of the metastatic deposit found in 1989 indicated to him that this spread could have been prevented by an earlier resection. Because the tumor was allowed to grow significantly and to metastasize, he felt that Mr. Boudoin's chance of survival was reduced by the eleven-month delay, but he was not asked to quantify that loss. Dr. Rigby acknowledged that, if the tumor were a mesothelioma, Mr. Boudoin would have had only a two-to-five-percent chance to survive five years from diagnosis.
In contrast, the defendant's expert in thoracic surgery, Dr. Watts R. Webb, testified that, whether this tumor was technically classified as a sarcoma or a mesothelioma, its earlier discovery and treatment could not have prevented or even postponed Mr. Boudoin's death. This opinion was based primarily upon the medical records, which showed that in only eleven months, the original tumor grew from the size of a golf ball to that of a child's-sized football, indicating it doubled six times from May 1988 to its removal in May 1989. This rapid cell growth would affect not only the tumor's size, but its rate of spreading elsewhere in the body. Dr. Webb thus felt that, despite the preoperative tests and the surgeon's detection of only a minute visible metastasis in 1989, this "very, very malignant" tumor had begun to spread before the first x-ray, so that an earlier resection would have had no effect on the ultimate outcome. Additionally, he testified, studies of this very rare cancer showed that it did not respond to either chemotherapy or radiation, resulting in almost unanimous agreement among the published reports that it was virtually incurable. In his experience, some patients might live a few months or a year with a cancer of the mesothelium like Mr. Boudoin's, but none as long as two years.
Dr. Milton W. Seiler, Jr., the medical oncologist who had administered Mr. Boudoin's chemotherapy, testified that because of the nature of the tumor involved here, he could not say with any certainty that this patient would have lived any longer if it had been diagnosed and treated earlier. However, in his opinion Mr. Boudoin "would have had a better chance" because the removal of a smaller malignancy "significantly decreases the chance of [it] being spread." While the absence of any tissue samples from May 1988 prevents him from "staging" the tumor at that point, if it had been Stage I, then Mr. Boudoin would have had a thirty-percent chance of surviving two years and a three- to five-percent chance of living five years without recurrence. In Dr. Seiler's view, by the time resection was done in May 1989 Mr. Boudoin's tumor had progressed to Stage III, meaning that without therapy, half of such patients would die in a little over seven months and none would survive two years, but better results would be seen with therapy. While it is likely that this tumor would have recurred even if detected eleven months *475 earlier, Dr. Seiler agreed that the lack of information from that point in time meant no one could be certain about what might have been.
Dr. Jim Talisman Pomeroy IV was presented by the plaintiffs as an expert in medical oncology. Based upon his review of Mr. Boudoin's records, Dr. Pomeroy estimated that there would have been a "good outlook" in May 1988 because at that time the mass was small and there had been no symptoms or other debility to affect the surgical outcome. Although he would defer to a pathologist's identification of the tumor, he felt this was a sarcoma that behaved like a mesothelioma. He testified that twenty to forty percent of patients can survive this type of sarcoma with early treatment. If it were a mesothelioma, in May 1988 Mr. Boudoin would have had a ten-percent chance of surviving five years, assuming the tumor had not yet metastasized. When the cancer became symptomatic and was detected the next year, Dr. Pomeroy felt the patient had about a five-percent chance of surviving five years, though probably not disease-free.[4]
Dr. William Stein was called as defendant's expert in medical oncology. In his opinion, because Mr. Boudoin's tumor was in the mesothelium, or the tissue lining the chest, even the earliest surgical resection would not have been an effective treatment. As demonstrated by the sudden and massive recurrence detected in July 1990, removal of all visible tumor does not affect the underlying disease process; whatever caused the cancer to occur in one spot could cause it to appear anywhere else in the mesothelium. Dr. Stein testified that this cancer, a sarcoma behaving like a mesothelioma, occurs in only a few hundred people a year in this country, but his personal experience and review of the literature indicated that, even with diagnosis and treatment in May 1988, Mr. Boudoin still would have died when he did. He estimated the median survival rate for tumors such as this as from two-and-a-half to three years, and assessed Mr. Boudoin's chance of surviving five years from May 1988 as "pretty small" because, out of one hundred people with this type of tumor, only five or ten of them would be alive five years later. Dr. Stein explained that since such estimates of life expectancy merely measure the length of time between the dates of diagnosis and death, an early detection will result in what appears to be a longer life span, "but that doesn't mean that the person will live any longer" than he would have otherwise.[5]
As previously noted, Dr. Hendler acknowledges that the testimony of some of these experts supports the finding that Mr. Boudoin suffered some loss of chance of survival due to the delayed detection of his tumor. He argues, however, that because "[a]ll other experts testified that the patient had essentially no chance of survival," there was no reasonable factual basis for the jury's finding of causation. This argument must fail, as it is well-established that "where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart v. State Dept. of Transportation & Development, 617 So.2d 880, 883 (La.1993).
Given the variances in the testimony outlined above, we cannot say the jury's decision in this case was unreasonable or unsupported. Although the experts agreed that the survival probabilities for a mesothelioma were extremely grim as compared to a sarcoma, there was no clear agreement as to whether Mr. Boudoin's cancer was a sarcoma, a mesothelioma, a sarcomatoid mesothelioma or a sarcoma that "behaved like" a mesothelioma. Significantly, however, the defense experts especially emphasized that those patients stricken with a mesothelioma rarely lived as long as two years even with aggressive treatment, yet Mr. Boudoin was shown to have survived at least two years *476 and seven months with his cancer.[6] In addition, several of the doctors testified that they would defer to a pathologist's expertise in identifying the type of tumor at issue, and it was shown in this case that, after detailed analysis and electron microscopy, Mr. Boudoin's cancer was classified by the treating pathologists as a pleural sarcoma. In view of this diagnosis and the general agreement on the favorable outlook if a sarcoma were promptly detected and treated while small, the jury could reasonably conclude that the eleven-month delay in this case contributed to Mr. Boudoin's failure to survive. Accordingly, the finding of causation is affirmed.

DAMAGES
As Dr. Hendler has noted, the Supreme Court rendered its opinion regarding the proper measure of damages for a lost chance of survival in Smith v. State Dept. of Health & Hospitals, 95-0038 (La.6/25/96), 676 So.2d 543, while this appeal was pending. Although the Supreme Court remanded in Smith for the trial court to decide damages in accordance with that opinion, we have all necessary testimony and evidence in this case. In addition, those damages awarded solely to compensate for Mr. Boudoin's losses, such as his medical expenses and pain and suffering,[7] must be vacated, as previously discussed. We will therefore perform a de novo review to determine this issue without further delay.
Although the Smith opinion states that "full recovery is not available for deprivation of a chance of survival of less than fifty percent," 95-0038 at 7, 676 So.2d at 547, our primary guidance as to the proper measure of such damages is found in footnote ten of that opinion:
Evidence of loss of support, loss of love and affection and other wrongful death damages is relevant, but not mathematically determinative, in loss of a chance of survival cases, as is evidence of the percentage chance of survival at the time of the malpractice. The plaintiff may also present evidence of, and argue, other factors to the jury, such as that a ten percent chance of survival may be more significant when reduced from ten percent to zero than when reduced from forty to thirty percent. The jury may also consider such factors as that the victim, although not likely to survive, would have lived longer but for the malpractice.
95-0038 at 11 n.10, 676 So.2d at 549. It was emphasized, however, that the sole loss being valuated was the loss of chance, and that a lump-sum award should result.
In an earlier loss-of-chance case, Tabor v. Doctors Memorial Hospital, 563 So.2d 233 (La.1990), the Supreme Court determined that each of a suicide victim's parents was entitled to receive $150,000 compensation, reduced for their comparative fault, for a doctor's failure to hospitalize the son, which might have prevented his suicide. In another such case, that court affirmed an award of $150,000 in survival and wrongful death damages for a physician's failure to diagnose lupus, a treatable disease, in a young woman who "fit the clinical picture" of that illness. Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1279 (La.1991). In Claudet v. Weyrich, 94-2347 (La.App. 4th Cir. 9/28/95), 662 So.2d 131, this court found that an award of $600,000 in general damages was not excessive, where a woman's chance of surviving breast cancer had been reduced from 75% to 33% by a delayed diagnosis. More recently, the Second Circuit applied the Supreme Court's Smith standard to award $400,000 to a cancer patient's surviving family members[8] as compensation for their own and the decedent's losses, based upon a reduction of at least one-third in the woman's chance for survival. Greer v. Lammico, *477 29,066 (La.App.2d Cir. 1/31/97), 688 So.2d 692.
In this case, Mrs. Boudoin testified that she and her husband married in 1963, when she was sixteen and he was eighteen, and that they had not separated at any time during their marriage. They had a very close and loving relationship because of their many shared interests and activities, such as fishing and camping. Mrs. Boudoin was a housewife until 1986, when she began working at Penney's after their daughter's marriage. Because she had thus always relied on her husband for both emotional and financial support, Mrs. Boudoin testified that his death left her depressed and scared. She had to struggle to earn her GED and attend a business college while working at the Superstore, but eventually was able to become self-supporting. An economist testified that, if Mr. Boudoin had lived, the present value of his earnings for the remainder of an average work life would range from approximately $80,000 to $284,000, depending on what type of work he had been able to do.
Considering this testimony, the testimony of the medical experts concerning the extent of the chance for survival lost because of Dr. Hendler's negligence, and the cited jurisprudence, we find that the $200,000 jury award for Rosalie Boudoin's "pain and suffering" is fair and adequate compensation for her loss of love and affection and other general damages. Considering the jury's determination that Dr. Hendler's wrong had also resulted in past and future lost income, however, we find she is entitled to an additional $50,000 for her loss of support.
Mr. Boudoin's two children also testified concerning the close and loving relationship each had enjoyed with their father. Charlene Boudoin Cavalier said that even after she had married in 1986 and moved out of her parents' home, she would talk to her father daily and visit with the family each weekend; she made daily visits after Mr. Boudoin's diagnosis and surgery. Elton Boudoin, Jr., testified that he lived at home until he was married, after his father's death, and that the two had worked together at Houma Industries. Based upon this testimony and the jurisprudence previously discussed, we find that $125,000 each to Charlene Boudoin Cavalier and Elton A. Boudoin, Jr. is appropriate compensation in this case.

DECREE
For the reasons assigned, the judgment rendered on August 4, 1995 is affirmed as to liability, but the damages awarded are amended in accordance with this opinion. Defendant is to bear all costs of this appeal.
AMENDED AND AFFIRMED AS AMENDED.
NOTES
[1] The appeal order includes the PCF as well as Dr. Hendler, but no brief was submitted on behalf of that entity.
[2] Mrs. Boudoin was allocated $55,770 against Dr. Hendler and $283,080 against the PCF, for a total of $338,850, while each child was allocated $22,115 against the doctor and $88,460 against the PCF, or $110,575 each.
[3] Plaintiffs also argued that the statute governing prescriptive periods for medical malpractice claims, La. R.S. 9:5628, is unconstitutional, relying on this court's opinion in Whitnell v. Silverman, 93-2468, 94-0343 (La.App. 4th Cir. 11/4/94), 646 So.2d 989. Because the Supreme Court subsequently reversed that decision, Whitnell v. Silverman, 95-0112, 95-0259 (La.12/6/96), 686 So.2d 23, we need not address this argument.
[4] On direct examination, Dr. Pomeroy opined that Mr. Boudoin had no chance of survival when the cancer was detected based upon his recollection that resection was aborted because the tumor was too extensive (the 1990 surgery). While his recall of the facts was not corrected, on cross examination he qualified his survival estimate for May 1989 in the manner detailed here.
[5] Dr. Stein referred to this phenomenon as "lead time bias."
[6] None of the experts advocating a diagnosis of mesothelioma was asked to explain this apparent "discrepancy" between the usual prognosis and Mr. Boudoin's experience, although Dr. Stein's discussion of "lead time bias" may have been an attempt to address this issue.
[7] Because the award of $204,000 for "lost wages and earning capacity" encompasses both pre and post-death losses, we consider the jury's determination on this element in our award to Mrs. Boudoin, as discussed below.
[8] The Greer opinion states that the decedent was survived by a husband and an unspecified number of children.